John **DILLARD**, et al., Plaintiffs,

v.

**BALDWIN COUNTY COMMISSION, et al., Defendants.**

No. CIV.A. 87–T–1159–N.

United States District Court, M.D. Alabama, Northern Division.

Sept. 3, 2002.

James U. Blacksher, Birmingham, Al, Lanie Guinier, Law School of University of Pennsylvania, Philadelphia, PA, Pamela Karlan, Stanford Law School, Stanford, CA, Julius L. Chambers, Janai S. Nelson, NAACP Legal Defense Fund, New York City, Larry T. Menefee, Mongomery, AL, Edward Still, Birmingham, AL, for John Dillard, Damascus Crittenden, Jr., Earwen Ferrell, Ullysses McBride, Louis Hall, Jr., Joe M. Horace, Willie E. Edwards, John Dillard,

Albert L. Jordan, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, Algert S. Agricola, Jr., Crosslin, Slaten & O'Connor, P.C. Montgomery, AL, Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, for Dale Eugene Brown, George R. Johnson, James Austin, Jr., Alvin Lee Pitts, Billy R. Smith,

## OPINION

MYRON H. THOMPSON, District Judge.

After 14 years, this lawsuit has come full circle, in that the issues before the court include not only whether the permanent injunction issued by this court in 1988 should be terminated but also whether the injunction should have been entered in the

first place. The original lawsuit, brought by the plaintiffs on behalf of all black citizens in Baldwin County, Alabama, charged that the at-large voting system used by the Baldwin County Commission violated § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973, and the fourteenth and fifteenth amendments to the United States Constitution, as enforced through 42 U.S.C.A. § 1983.[1] In 1988, the court found a § 2 "results" and "intent" violation and entered an injunction ordering that the Baldwin County Commission's size be increased from four to seven members and that those members be elected from single-member districts. *Dillard v. Baldwin County Comm'n*, 694 F.Supp. 836, 845 (M.D.Ala.1988), *amended by* 701 F.Supp. 808 (M.D.Ala.1988), *aff'd*, 862 F.2d 878 (11th Cir.1988) (table).

In October 1996, Dale Brown and others moved to intervene in the case as plaintiffs, but, unlike the plaintiffs, they sought to have the court's 1988 remedial injunction vacated in light of the Supreme Court's decision in *Holder v. Hall*, 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). The court granted the intervenors' motion. Later that year, the plaintiffs moved to dismiss the complaint-in-intervention. In June 1999, the court granted that motion, finding the intervenors failed to state a claim upon which relief could be granted. *Dillard v. Baldwin County Comm'n*, 53 F.Supp.2d 1266 (M.D.Ala. 1999).

The intervenors appealed, and, in September 2000, the Eleventh Circuit Court of Appeals reversed this court's decision and remanded for consideration of the intervenors' claims. *Dillard v. Baldwin County Comm'ns*, 225 F.3d 1271, 1283 (11th Cir. 2000). The appellate court said that this court "should consider whether the fact that the 1988 injunction was predicated on findings of intentional discrimination by the legislature has any impact on how *Holder, Nipper [v. Smith*, 39 F.3d 1494 (11th Cir.1994)], and *White [v. Alabama*, 74 F.3d 1058, 1060 (11th Cir.1996),] affect this case." *Id.* at 1282. More specifically, the court wrote that, "While *Holder, Nipper*, and *White* make clear that changing the size of the Baldwin County Commission was an improper remedy for a section 2 violation, the cases do not address whether such a remedy might have been appropriate to remedy a violation of the Fourteenth Amendment." *Id.*

On remand, the three groups of parties to this case—the plaintiffs, the intervenors, and the defendants—seek three different remedies.[2] The plaintiffs contend that the court's 1988 findings of intentional discrimination were so broad as to require the court to uphold its 1988 injunction as a proper remedy at the time; additionally, they argue the court should further modify its 1988 injunction in light of changed circumstances to provide for seven commissioners to be elected at-large by cumulative or limited voting. The defendants, too, argue that the court's 1988 findings of fact support its having increased the size of the commission and imposed single-member districts; however, the defendants argue that no further changes to that injunction should be made and that

---

1. This lawsuit was initiated by plaintiff John Dillard and others, and, later, Billy R. Smith and others intervened and the joined them as plaintiffs. Because their interests are identical, the court refers to both plaintiff groups as the plaintiffs.

2. Baldwin County Probate Judge Adrian Johns is also a defendant in this case, separate from the County Commission member defendants. However, because any relief will not affect him, he say he views himself as more an "amicus"; his position in this case is also aligned with that of the Brown intervenors. The court has therefore not treated him as a separate party.

the current seven single-member district structure should be kept in place. Finally, the intervenors argue that the court's 1988 injunction was improper insofar as it increased the size of the county Commission; the intervenors, however, would not have the commission return to the four-member at-large system but rather they request that the court impose four single-member districts.

Unfortunately, the current state of the law is such that, on the evidence presented in 1988 and now, the court may not grant the relief any of the parties seeks. Instead, for the reasons that follow, the court concludes, first, that its 1988 injunction was an improper remedy under the fourteenth and fifteenth amendments given the scope of its findings of intentional discrimination in 1988, and therefore orders that injunction be dissolved. Second, based on additional findings of fact following a bench trial on August 15, 2002, the court further concludes that no additional relief is permitted. In other words, unless and until state or federal law requires or allows otherwise, the Baldwin County Commission shall return to the system of four members elected at-large used before the court's 1988 injunction. The court will retain jurisdiction solely for the purpose of supervising the undoing of the 1988 injunction.

I.

As noted above, the Eleventh Circuit Court of Appeals remanded the intervenors' claims for consideration as to whether this court's 1988 injunction was a proper remedy in light of this court's 1988 findings of intentional discrimination. The rule for constitutional vote-dilution claims was set forth in *Johnson v. Desoto County*

*Board of Commissioners,* 204 F.3d 1335 (11th Cir.2000). There, the court said that to establish a constitutional vote-dilution claim, "Plaintiffs must show that: (1) the county's black population lacks an equal opportunity to participate in the political process and elect candidates of its choice; (2) this inequality of opportunity results from the county's at-large voting scheme; and (3) a racially discriminatory purpose underlies the county's voting scheme." 204 F.3d at 1345 (citations omitted).

 Simply put, for the plaintiffs to succeed on an constitutional challenge to a voting system, they must show discriminatory intent behind the system, discriminatory effects of the system, and a causal link between the two. To prove that causation, "a plaintiff must establish that 'an alternative election scheme exists that would provide better access to the political process.'" *Johnson,* 204 F.3d at 1346 (quoting *Burton v. City of Belle Glade,* 178 F.3d 1175, 1199 (11th Cir.1999)). Without such a showing, the challenged voting practice is not responsible for—that is, did not cause—the plaintiffs' injury. *See id.*

II.

In 1988, the court made numerous findings of fact that the State of Alabama had engaged in a century-long pattern and practice of intentional discrimination in voting against its African–American citizens. The court now must return to those findings to determine whether the plaintiffs proved such discriminatory intent, effects, and causation to justify under the fourteenth and fifteenth amendments the court's 1988 injunction.

Briefly summarized, the court's 1988 findings of fact were as follows.[3] Baldwin

3. As noted in the court's 1988 decision in this case, the voting system used by the Baldwin County Commission was the same as the one used by the county school board. *Baldwin County Comm'n,* 694 F.Supp. at 838. As

such, the court, without objection, adopted its findings from the school board case, *Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp.

County, at the time, was governed by a board of four commissioners. *Baldwin County Comm'n*, 694 F.Supp. at 837. A candidate for commissioner was required to run at-large with all voters in the county allowed to vote for the candidate. *Id.* Candidates, however, were forced into head-to-head competition by the use of a "numbered post" or separate place. *Id.* at 837–38. Each commissioner position carried a separate number, and each candidate qualified for a specific number and place, with each voter allowed to vote for only one candidate in each place. *Id.* Finally, a candidate was required to receive a majority of votes cast in the primary to win the nomination of a political party.[4] *Id.*

The court also found that, according to the 1980 census, 15.35 % of Baldwin County's residents were black, *id.* at 837, and predicted that the number would decrease to less than 14 % by 1990. *Id.* at 839.

Finally, the court made numerous findings as to other conditions that existed at the time in Baldwin County. *Id.* at 839, n. 7. The first of those findings pertinent to the question now before the court was that "from the late 1880's to the present the State of Alabama and its political subdivisions have 'openly and unabashedly' discriminated against their black citizens by ... enacting such laws as the anti-single-shot voting laws, [and] numbered place laws.... Without question, the present depressed levels of black voter participation in Baldwin County can be traced to these historical devices and laws." *Id.* (quoting *Dillard v. Baldwin County Bd. of Educ.*, 686 F.Supp. 1459, 1467–68 (M.D.Ala.1988)). Also important today was the court's 1988 finding that the majority-vote requirement and the numbered post requirement acted in conjunction with the at-large voting system to create an "insurmountable" political

barrier to the ability of blacks in Baldwin County to elect candidates of their choice. *Id.* The third of those findings pertinent to the question the court is answering today was the court's finding that the Alabama Legislature "engaged in a century-long pattern and practice of switching between local at-large election systems and local single-member district systems as needed to diminish black voting strength." *Id.* at 839.

### III.

As discussed above, under the Eleventh Circuit's opinion in *Johnson*, for this court's 1988 injunction to have been appropriate as a remedy for a constitutional violation, the evidence must support findings of a discriminatory intent, discriminatory effects, and a causal link between the two.

In 1988, the court recognized that the at-large voting scheme used to elect the Baldwin County School Board was a product of "intentional" racial discrimination, and implied that the at-large system used to elect the County Commission was a product of that same intent. *Baldwin County Comm'n*, 694 F.Supp. at 838. The court came to this conclusion by noting that the Alabama Legislature reshaped local at-large election schemes by enacting anti-single shot laws in the 1950's and numbered place laws in the 1960's. *Id.* Additionally, the court relied on its finding that the legislature engaged in a century-long pattern and practice of switching between local at-large election systems and local single-member district systems as needed to diminish black voting strength. *Id.* And the court identified a broad discriminatory intent by the Alabama Legislature to restrict blacks' voting power in its enactment of single shot voting laws

---

1459 (M.D.Ala.1988), for use in the case against the commission.

4. There was no majority-vote requirement for general elections.

and numbered place laws and in those laws' interaction with at-large voting.[5] *Id.* at 843. Notably, the court made no findings as to any discriminatory intent with respect to the size of the Baldwin County Commission.

The court also found that blacks in Alabama were suffering from discriminatory effects in voting in 1988. Particularly, it found that "the at-large system was still having its intended racist effect." *Id.* at 839. The court concluded that Baldwin County's "at-large system, including in particular its majority-vote and numbered-post features, has interacted with the extensive racial polarization in the county to render the ability of the black voters to elect their representative substantially inferior to that of whites." *Id.* at 840 (*quoting Baldwin County Bd. of Educ.,* 686 F.Supp. at 1467).

■ These findings standing alone, however, do not satisfy the plaintiffs' burden under *Johnson.* Because the plaintiffs produced no evidence, in 1988, proving discriminatory intent as to the size of the Baldwin County Commission, they failed to establish a constitutional violation with regard to the size of the commission. The court therefore exceeded its authority when it ordered that the commission be increased from four to seven members. *See Milliken v. Bradley,* 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977) ("[F]ederal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.").

■ Additionally, these 1988 findings did not justify the court's order requiring the use of single-member districts in Baldwin County. The court was mistaken in its implication that the at-large system used to elect the Baldwin County Commission was created with discriminatory intent. No evidence was produced in 1988 showing a history in Baldwin County of switching between at-large voting and single-member districts to minimize black voting strength. Rather, that practice never occurred in Baldwin County; it appears, instead, that until the court ordered single-member district to be used in 1988, Baldwin County commissioners had been elected at-large since the 1896 election.

■ Finally, these findings did not justify the court's conclusion that the Alabama Legislature's enactment of numbered place laws in the 1960's for racially discriminatory reasons tainted the Baldwin County's Commission voting scheme. The 2002 evidence reflects that, in 1931, a law was enacted providing for the four commissioners to be elected at-large but with the county divided into four districts and with one commissioner to reside in each district. As it ends up, the enactment of numbered place laws in the 1960's simply had no effect on how the Baldwin County Commission was elected.

■ Moreover, even if Baldwin County's at-large scheme had been created with a discriminatory intent and had a discriminatory effect, the plaintiffs in 1988 still proved no causal link between the two. For, under *Johnson,* this causal link could only have been shown if the plaintiffs had

---

5. According to the plaintiffs' expert, Richard L. Engstrom, single-shot voting occurs when a "group's voters cast a vote for the candidate that they want elected, and withhold the rest of their votes from all of the other candidates so as not to add to the vote totals of those other candidates." Plaintiffs' exhibit 10, Expert Report by Richard L. Engstrom, at 12 (introduced at trial on August 15, 2002). In theory, this should enhance a group's ability to elect the candidate of its choice (though the success of this strategy depends on a number of other factors). *Id.* at 12, n. 6.

established the existence of an alternative election scheme that would have provided blacks in Baldwin County with better access to the political process. 204 F.3d at 1346. Because the court did not have the authority to increase the size of the Baldwin County Commission from four to seven seats, any "alternative election scheme" using single-member districts would have necessarily used four, rather than seven, such districts; in 1988, four single-member districts would not have provided blacks in Baldwin County with better access to the political process because no majority-minority district could have been created. As the court found at the time, "to create a majority-black voting-age district in the county, the size of the Commission must be increased to seven." *Baldwin County Comm'n*, 694 F.Supp. at 843. Because four single-member districts would not have provided blacks in Baldwin County with better access to the political process, the plaintiffs in 1988 could not have shown a causal link between Baldwin County's at-large system and any discriminatory effect suffered by blacks in Baldwin County.

So, under *Johnson*, even if Baldwin County's at-large system had been created with racially discriminatory intent, it caused no constitutional harm. In other words, blacks in Baldwin County would have suffered from diluted voting strength in either an at-large system or a system of four single-member districts. As such, Baldwin County's at-large system did not cause plaintiffs harm and therefore could not be changed to a system of single-member districts as a constitutional remedy.

■ It is clear, therefore, that the court's 1988 injunction was not proper to remedy the constitutional harm suffered by the plaintiffs. First, it was improper because the plaintiffs failed to show any discriminatory intent behind the number of county commissioners for Baldwin County.[6] Second, it was improper because there was no discriminatory intent behind the Baldwin County Commission's at-large election scheme. Third, it was improper because there was no discriminatory intent behind Baldwin County Commission's numbered place requirement. For these reasons, the court cannot grant the defendants' requested relief, that is, that the court allow its 1988 injunction to stand without change; nor can the court grant the intervenors' requested limited remedy of single-member at-large districts. Instead, the court must find that its 1988 injunction was improper and order it dissolved in its entirety.

## IV.

■ Nevertheless, it must be remembered that the plaintiffs do not want a return to the 1988 injunction anyway. Instead, they ask that court use an alternative voting scheme, such as cumulative voting or limited voting.

The plaintiffs have shown that black citizens of Baldwin County still suffer from the racially polarized voting and from historically depressed conditions, economically and socially. They have further shown that cumulative voting or limited voting would allow these citizens a substantial and effective opportunity to participate in the political process. As the Seventh Circuit Court of Appeals has explained, "[R]ather than using race as a proxy for voting preference, such a system allows voters to draw their own jurisdictional boundaries, decide which local govern-

---

6. To be sure, the Alabama Legislature and the Baldwin County delegation to the legislature have steadfastly refused to adopt a seven-member commission in a local act. However, this evidence is insufficient, as a matter of law, to support the conclusion that this failure was inspired by racial animus.

ments were most important to them, and allocate their votes accordingly.... All minority groups may potentially benefit from such a system—not just racial minorities.... Indeed, cumulative voting does not compartmentalize voters according to their race." *Harper v. City of Chicago Heights,* 223 F.3d 593, 602 (7th Cir.2000) (citation omitted).

However, the plaintiffs did not produce, as required by *Johnson,* evidence to show that Baldwin County had some underlying discriminatory purpose to its use of traditional voting rules. The plaintiffs pointed the court toward an 1870 statute enacted by the State Board of Education (acting at the time in lieu of the legislature) for use in Mobile County as one "rare occasion" when, for six years, the State of Alabama used a version of limited voting for the purpose of providing Mobile African-American citizens equal voting rights. *Brown v. Board of School Comm'rs of Mobile County,* 542 F.Supp. 1078, 1088–89 (S.D.Ala.1982), *aff'd,* 706 F.2d 1103 (11th Cir.1983), *aff'd,* 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983). This isolated incident fails to meet the plaintiffs' *Johnson* burden of showing that traditional voting rules were used in Baldwin County for a discriminatory purpose. In particular, there is no evidence that limited or cumulative voting schemes occupy such a traditional and accepted place in Alabama's legislatively enacted voting schemes that it can be concluded that the failure to impose one of them in Baldwin was the result of intentional discrimination. As such, the court may not grant the plaintiffs' proposed remedy, because it is over-broad and would eliminate a condition that does not violate the constitution. *See Milliken,* 433 U.S. at 282, 97 S.Ct. at 2758.

## V.

To be sure, as recounted by the court, Alabama's black citizens have suffered a century and a half of debilitating and hu-

miliating discrimination in voting that has left many of them economically, socially, and politically depressed. However, under federal law, which requires a causal connection between these circumstances and the current election scheme, those in Baldwin County who remain victims today have no unblocked path of voting relief leading into the federal courts.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) All outstanding remedial orders and judgments restructuring the Baldwin County Commission are vacated.

(2) All requests for the court to change the way in which the Baldwin County Commission is elected different from the one that existed before the 1988 injunction are denied.

(3) The defendants are submit to the court, within 14 days, a plan providing as soon as is feasible for the election of county commissioners under an election scheme that is completely free of the 1988 injunction.

(4) The court retains jurisdiction for the limited purpose of supervising the undoing of the 1988 injunction.