ALASKA INTER–TRIBAL COUNCIL; Alaska Native Justice Center; Akiachak Native Community; Akiak Native Community; Native Village of Aleknagik; Chinik Eskimo Community (Golovin); Native Village of Clark's Point; Native Village of Gambell; Native Village of

Kiana; Native Village of Teller; Tuluksak Native Community; Native Village of White Mountain; Hazel Apok; Sharon Clark; Ester Floresta; Imogene Gardiner; Willie Kasayulie; and Mike Williams, Appellants,

v.

STATE of Alaska; Delbert Smith, Commissioner; Department of Public Safety, Appellees.

No. S–10844.

Supreme Court of Alaska.

April 15, 2005.

Rehearing Denied June 28, 2005.

---

Lawrence A. Aschenbrenner, Anchorage, Eric D. Johnson, Bethel, and Carol E. Daniel, Anchorage, for Appellants.

James L. Baldwin, Michael G. Mitchell, and Dean J. Guaneli, Assistant Attorneys General, and Gregg D. Renkes, Attorney General, Juneau, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

The appellants are plaintiffs who sued the State of Alaska, alleging that its allocation of law enforcement services violates the constitutional rights of residents of "off-road," predominantly Alaska Native, communities. Among other things, the plaintiffs alleged that the state violates their federal and state rights to equal protection of the law by adopting or creating a de jure discriminatory system of law enforcement, by engaging in intentional racial discrimination in providing law enforcement services, and by discriminating against residents of off-road, outlying communities in providing law enforcement services. The superior court rejected all of their claims, in part on summary judgment and in part following a bench trial. The plaintiffs argue here only that it was error to reject their federal and state equal protection claims. We conclude that the superior court did not err in holding that they did not prove that the state adopted or established a de jure discriminatory law enforcement system. We also hold that it did not err in rejecting after trial their state equal protection claim that alleged that the state's law enforcement system is linked to a discriminatory intent or purpose. The rejection of that claim after trial renders harmless their argument that

the court erroneously dismissed their corresponding federal claim on summary judgment. We also conclude that the superior court did not clearly err in holding that off-road and on-road communities are not similarly situated. We therefore affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

This appeal concerns plaintiffs' claims that the State of Alaska, in allocating state law enforcement services, unconstitutionally discriminates against residents of small rural, predominantly Native, communities that are not on the state road system. Plaintiffs refer to these communities as "off-road predominantly Native communities" and as "Native Villages." The state describes them as "isolated," "geographically cut off from the rest of the state," "predominantly populated by Alaska Natives," "off-road," and "rural Alaska." For simplicity, we will sometimes refer to them as "off-road" communities, and will sometimes refer to communities on the state road system as "on-road."

Residents of Alaska receive law enforcement services in various ways. Most are served by police officers employed by their local governments. The Alaska Police Standards Council (APSC), which establishes minimum standards for police officers in Alaska, certifies these officers.[1] APSC issues certificates to persons who satisfy the standards for "police officers."[2] A person may not be appointed a non-probationary police officer in Alaska without meeting those standards.[3] Law enforcement services provided by local municipal police departments are not at issue here.

Alaskans who live in places that do not have local certified police officers receive law enforcement services from the Alaska State Troopers, a division of the Alaska Department of Public Safety. Troopers are certified as police officers by the APSC. Troopers must receive at least 440 hours of training in law enforcement; they actually receive 1100 hours of training. In addition to law enforcement, troopers provide traffic enforcement, search and rescue coordination, Civil Air Patrol support, court security, sex offender registration, and prisoner transportation services.

The Alaska State Troopers are organized into five detachments encompassing large regions across the state. Detachment A covers Southeast Alaska. Detachment B covers Southcentral Alaska, including the Mat–Su Valley, portions of the Anchorage Bowl, and areas east to the Canadian border. Detachment C covers Western Alaska, Kodiak Island, and the Aleutian Chain. Detachment D covers Interior and Northern Alaska. Detachment E covers the Kenai Peninsula.

The communities and individuals bringing this lawsuit are located within Detachment C. It contains the greatest concentration of off-road Native villages, including sixty-five percent of the federally-recognized tribes in Alaska, and has an area nearly the size of Texas.[4]

Troopers are not stationed in every community within each detachment. They are instead posted in hub communities that have transportation links to other areas within the detachment. In Detachment C, troopers are stationed in hub posts in Aniak, Bethel, Dill-

---

1. AS 18.65.140 creates the APSC, a panel authorized by statute to "establish minimum standards for employment as a police officer, probation officer, parole officer, municipal correctional officer, and correctional officer in a permanent or probationary position" and to certify persons as qualified to hold those positions. AS 18.65.220.

2. AS 18.65.240(b). AS 18.65.290(6)(A) defines "police officer" to mean
 a full-time employee of the state or a municipal police department with the authority to arrest and issue citations; detain a person taken into custody until that person can be arraigned before a judge or magistrate; conduct investigations of violations of and enforce criminal

laws, regulations, and traffic laws; search with or without a warrant persons, dwellings, and other forms of property for evidence of a crime; and take other action consistent with exercise of these enumerated powers when necessary to maintain the public peace. . . .

3. AS 18.65.240(a).

4. The commander of Detachment C testified that it encompasses an area of about 260,000 square miles. Texas's area is 268,581 square miles. U.S. DEPT. OF COMMERCE, BUREAU OF CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES 213 (2004).

ingham, Galena, King Salmon, Kodiak, Kotzebue, Nome, and St. Mary's. King Salmon, with a population of approximately 440 in 2000, is the smallest of these "hub" communities.[5]

Troopers in hub posts provide some law enforcement services to residents of outlying communities, but generally only respond to emergencies or reported felonies. Troopers in on-road posts also patrol roads within their jurisdiction. As of 2002 the starting salary for a trooper was approximately $19 per hour. As of 2002 there were 237 Alaska State Troopers, 185 of whom were below the rank of sergeant and actively engaged in case investigation.

Many off-road communities that have neither local municipal certified police nor a local trooper post receive some local law enforcement services from Village Police Officers (VPOs) or Village Public Safety Officers (VPSOs). VPOs and VPSOs are not certified by the APSC. A VPO may only serve in an incorporated "community off the interconnected Alaska road system, with a population of less than 1,000 persons."[6] Similarly, a VPSO may only serve in "a community with a population of less than 1,000 individuals."[7]

The VPO program began when James M. Fitzgerald, then Commissioner of Public Safety, in 1959 proposed establishing a "constable" program to "provid[e] improved State Police service in remote villages and communities."[8] In a letter to State Police District Commanders, Commissioner Fitzgerald wrote:

I am in receipt of daily requests from communities throughout Alaska for resident police services. This of course would be prohibitively expensive were we to utilize regular State Police Officers. Yet, there is a definite requirement in many of these villages for local police officers to "keep the peace." This need cannot be met by sending State Police officers from cities which are several hundred miles distant. A good deal of thought has been given to this matter, and I have considered the feasibility of appointing special State Police "Constables" amongst the native and eskimo population of these villages and communities.... They would receive special training in effecting an arrest and in the enforcement of misdemeanor statutes.... I would not expect them to be on duty during given hours, but I would expect that they be available within the community to provide immediate police service when the occasion presents itself.... Major crimes would, of course, be immediately referred to the State Police, but pending the arrival of these personnel, the Constables could provide an important service by preserving the scene, securing necessary information or identifying suspects.

The parties agree that Commissioner Fitzgerald's constable program became the Village Police Officer program, which was established in 1963 and continues to operate today.

As of 2002 eighteen communities in Alaska had VPOs. VPOs are appointed by their village and are independent of the Alaska Department of Public Safety.[9] They are required to receive forty-eight hours of instruction and training, including ten hours of first aid instruction.[10] Apparently no VPO has received this much training. VPOs are not armed. Many VPOs are paid with funding from Community Oriented Policing Services grants from the federal government. As of 1999 many VPOs earned $7 per hour; they received no overtime pay.

The VPSO program dates back to the late 1960s when then-Trooper Lieutenant William Nix (later Commissioner of Public Safety) became supervisor of trooper outposts.

---

5. See http://censtats.census. gov/data/AK/1600239 630.pdf (last visited Apr. 8, 2005).

6. 13 Alaska Administrative Code (AAC) 89.010(b), .150(3) (2002).

7. 13 AAC 96.900(12) (2002).

8. Commissioner Fitzgerald became a superior court judge in 1959, a justice of this court in 1972, and a United States District Court Judge in 1975. See http://www.fjc.gov/ Public/home.nsp/hisj (last visited Apr. 8, 2005).

9. 13 AAC 89.020(a) (2002).

10. 13 AAC 89.040(a) (2002).

While serving in that role, Lieutenant Nix developed concerns about the sufficiency of the VPO program. He was quoted in a trooper history as recalling that the Department of Public Safety "needed to broaden the function of these village officers to train them to provide emergency medical assistance and organize local fire-fighting and search-and-rescue groups. . . . Trying to make them just police officers was a waste of money."

In 1971 then-Captain Nix proposed the creation of a "special constable" position within the Department of Public Safety. Captain Nix noted that the department had received complaints "by citizens living in rural Alaska that remote areas are being discriminated against when it comes to the State's providing law enforcement services." Captain Nix called allegations that the state directed personnel and funding to larger metropolitan regions and provided poor service to remote areas "true in many respects." He explained that "the level of service provided by the State Troopers in rural areas is below standard when compared to operations in the larger metropolitan areas." Captain Nix faulted insufficient "funds, planning and personnel" for the deficiencies. He proposed a special constable program to increase "the inclusion of bilingual Alaskan Natives into the Alaska State Trooper structure" and to develop "a core of well trained Alaska Natives, who in turn may one day be instrumental in assisting their people to establish and maintain city or borough police departments." He envisioned the special constables as Alaska Natives who would travel with troopers, assist troopers in providing law enforcement services, serve as interpreters, help train village police officers, and increase cultural understanding between the troopers and the residents of Native villages. The special constable program apparently operated in Alaska from 1971 to 1988.

In 1980 then-Commissioner Nix proposed the VPSO program. The program began with funding from a federal Law Enforcement Assistance Administration grant. The concept paper for the VPSO program explained that "[r]ural Alaska" had the worst "record for public safety" anywhere in the United States. The paper noted that most "predominantly native villages" did not have the funds to hire a local police officer. It found that a small village of under 300 residents did not need a full time police officer, fire fighter, or paramedic. The paper recognized that "although these various skills are needed—indeed are desperately needed—the delivery system must be structured to meet the needs of far fewer people with substantially fewer public safety problems of generally less complexity than urban conditions present." Commissioner Nix and his staff envisioned the VPSOs as "individuals with a broad array of public safety skills." Although VPSOs would not receive as much training in a specific field as police officers, fire fighters, or paramedics would in their respective disciplines, they would receive training in each field sufficient to meet most of the public safety needs of a small community.

The VPSO program is now organized by statute within the Department of Public Safety.[11] The department awards grants to nonprofit regional Native corporations, which then hire and assign VPSOs to villages within the corporations' regions.[12] VPSOs are required to receive at least 240 hours of basic training.[13] As of April 2002 VPSOs received approximately 360 hours of training. Eighty of those hours are in fire safety and suppression.

As their name implies, VPSOs are not solely law enforcement officers. They are also trained to provide "emergency medical

**11.** AS 18.65.670(a) provides:
> There is created in the Department of Public Safety a village public safety officer program to assist local governments and villages through nonprofit regional corporations to appoint, train, supervise, and retain persons to serve as village public safety officers to administer functions relative to
> (1) the protection of life and property in rural areas of the state; and

> (2) providing probation and parole supervision to persons under supervision by communicating with and monitoring the activities and progress of these persons at the direction of probation and parole officers.

**12.** 13 AAC 96.010–.900 (2002).

**13.** 13 AAC 96.100 (2002).

response, water safety, fire prevention, search and rescue, probation and parole" services. VPSOs investigate misdemeanors that occur in their villages, but are generally not permitted to investigate felonies. Except in emergencies, VPSOs may not carry . firearms.[14] VPSOs are instructed by the troopers not to confront armed offenders.. The starting salary for VPSOs differs for each nonprofit regional corporation. In 2002 the starting hourly pay rate for a VPSO ranged between $13.78 and $17.61, and averaged $15.99. As of 2002 seventy-two communities had VPSOs. The VPSO appropriation in the budget of the Department of Public Safety allowed for eighty-four VPSOs in 2002, although some of those positions were vacant.

As of April 2002 there were 237 troopers available for law enforcement for the entire state outside of localities with municipal police departments. According to the 2000 federal census and undisputed statistics submitted by the plaintiffs in the superior court, there are 165 places in Alaska that are off the interconnected road system, that have a population of twenty-five or more, and that do not have local APSC-certified police. These 165 places have a total population of 42,265; of that total, 32,265 are Alaska Natives. Of these 165 places, 130 have a population that is over fifty percent Native. . Of the 165 communities, seventy-two have a VPSO and twenty-seven have a VPO. Because some places have both a VPSO and a VPO, ninety communities have either a VPSO, VPO, or both. Of the 130 predominantly Native communities, eighty-five have either VPSOs or VPOs, and forty-five have no local resident law enforcement service. Of the thirty-five predominantly non-Native

communities, five have either VPSOs or VPOs and thirty have no local resident law enforcement service.

## B. Proceedings

The plaintiffs filed their complaint in 1999. The plaintiffs were two Alaska Native advocacy groups, ten predominantly Alaska Native communities located off the road system, and six individual Alaska Natives who live in communities off the road system.[15] As the lawsuit proceeded, the superior court dismissed some of the plaintiffs. The six individual plaintiffs and the communities of Akiachak and Tuluksak were the only remaining plaintiffs at trial.

The defendants named in the original complaint were the State of Alaska, Ronald Otte, in his capacity as Commissioner of Public Safety,[16] and the Alaska Police Standards Council. The original complaint alleged that the defendants "fail[ed] to provide minimally adequate police protection to off-road Native villages and ... discriminat[ed] against them in the provision of State law enforcement services." It also alleged that the defendants violated the plaintiffs' rights to due process, equal protection, and law enforcement protection under the Fourteenth Amendment of the United States Constitution and article I, sections 1, 3, 7, 12, and 24 of the Alaska Constitution.

The plaintiffs sought declaratory and injunctive relief. Their complaint asked for a preliminary injunction precluding the defendants "from using federal funds in State law enforcement programs until they submit a plan, approved by this Court, to cease their discriminatory conduct toward Alaska Native Villages in the provision of police protection

14. 13 AAC 96.040(8) (2002).

15. The original plaintiffs were: the Alaska Inter-Tribal Council; the Alaska Native Justice Center, Inc.; Akiachak Native Community; the Akiak Native Community; the Native Village of Aleknagik; the Chinik Eskimo Community (Golovin); the Native Village of Clark's Point; the Native Village of Gambell; the Native Village of Kiana; the Native Village of Teller; the Tuluksak Native Community; the Native Village of White Mountain; Hazel Apok, an Alaska Native resident of Kiana; Sharon Clark, an Alaska Native resident of Clark's Point; Esther Floresta, an Alaska Native resident of Clark's Point; Imogene Gardiner, an Alaska Native resident of Clark's Point; Willie Kasayu-

lie, an Alaska Native resident of Akiachak; and Mike Williams, an Alaska Native resident of Akiak.

16. Ronald Otte was commissioner when plaintiffs filed their original complaint. Glenn Godfrey was commissioner when plaintiffs filed their second amended complaint and at the time of trial. Delbert Smith was commissioner when plaintiffs filed their appeal and he was substituted as an appellee for Godfrey. Bill Tandeske is the current commissioner. See http://www.dps.state.ak.us/Comm /asp/tandeske.asp (last visited Apr. 8, 2005).

and eliminate the effects of their past discrimination." Their complaint also asked the superior court to permanently enjoin the defendants "from discriminating against off-road outlying communities in the provision of police protection or from adopting policies, regulations or otherwise taking actions which would provide off-road, outlying communities a lesser level of police protection than provided on-road communities." Finally, it sought a permanent injunction preventing the defendants "from using State or federal funds in State law enforcement programs that unlawfully discriminate against Alaska Native villages or other off-road, outlying communities in the provision of law enforcement services."

Superior Court Judge Karen L. Hunt, to whom the case was then assigned, denied plaintiffs' motion for a preliminary injunction. She reasoned that the plaintiffs did not make a clear showing of probable success on the merits. On June 7, 2000, Judge Hunt also (1) denied the state's motion to designate the lawsuit as a class action; (2) ruled that the Alaska Inter–Tribal Council lacked standing as an institution and thus must represent its membership or be dismissed from the case; and (3) dismissed as plaintiffs the eight off-road Native villages that are located within municipalities. The Alaska Inter–Tribal Council later notified the superior court that it did not represent its membership.

Plaintiffs' second amended complaint pleaded eight causes of action asserting various legal theories. Only their second, third, and fourth causes of action are at issue in this appeal. Each of these three causes of action alleged federal and state equal protection violations.[17]

Plaintiffs' second cause of action asserted that the state presently operates a de jure race-based system of law enforcement that either is traceable to a de jure race-based pre- or post-statehood system of law enforcement, or was intentionally created after statehood.[18] We sometimes refer to this as their "de jure race-based system" or "de jure" claim.

Plaintiffs' third cause of action asserted that the state engages in intentional racial discrimination in the way it provides police protection by certified police officers, resulting in a disparate impact on Alaska Natives.[19] We sometimes refer to this as their "disparate impact" or "racial discrimination" claim.

Plaintiffs' fourth cause of action asserted that the state discriminates against residents of "off-road outlying communities" in providing police protection.[20] We sometimes refer to this as their "geographical discrimination" claim.

17. Section 1 of the Fourteenth Amendment of the United States Constitution provides in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article I, section 1 of the Alaska Constitution provides:

This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

18. The second cause of action of the second amended complaint asserted:

The State's intentional adoption of the territorial government's de jure race-based dual system of law enforcement, its intentional use of race in the design of its own de jure race-based dual system, and the continued operation of such system by the State to the present day, constitutes intentional racial discrimination in violation of Plaintiffs' rights to Equal Protec-

tion of the law under the Fourteenth Amendment to the United States Constitution, Article I, §§ 1, 3, and 7 of the Alaska Constitution and 42 U.S.C. § 1983.

19. The third cause of action of the second amended complaint asserted:

Because the State's discriminatory treatment of Plaintiffs in the provision of police protection is based on race, the disparate impact of the dual system on Alaska Natives in the provision of APSC-certified police protection is attributable to intentional racial discrimination by the State, and therefore violates Plaintiffs' rights to Equal Protection of the law under the Fourteenth Amendment to the United States Constitution and Article I, §§ 1, 3, and 7 of the Alaska Constitution and 42 U.S.C. § 1983.

20. The fourth cause of action of the second amended complaint asserted:

The State's disparate treatment of residents of off-road outlying communities, including the Plaintiff villages and their residents, in the provision of police protection, discriminates

The case was assigned to Superior Court Judge Sharon L. Gleason when Judge Hunt retired. By order of December 4, 2001, Judge Gleason granted the state's motion to dismiss the Alaska Native Justice Center as a plaintiff; Judge Gleason based this ruling on Judge Hunt's decision dismissing the Alaska Inter–Tribal Council as a plaintiff.

The state moved for summary judgment on all claims. By order of February 13, 2002, Judge Gleason granted the state's motion in part and denied it in part. The February 13, 2002 order granted summary judgment to the state on plaintiffs' federal and state substantive due process claims and on their claims under article I, sections 12, 14, and 24, and article VII, sections 4 and 5, of the Alaska Constitution.[21] It also granted summary judgment to the state on the federal equal protection claim asserted in plaintiffs' fourth cause of action, which alleged geographic discrimination. These rulings are not at issue on appeal.

The February 13, 2002 order also granted summary judgment to the state on the federal equal protection claim set out in plaintiffs' third cause of action, which alleged disparate impact resulting from intentional racial discrimination in providing police protection. The order denied summary judgment to the state on the federal equal protection claim set out in plaintiffs' second cause of action, which alleged that the state operates a de jure race-based dual system of law enforcement. It also denied summary judgment to the state on the state-based equal protection claims asserted in plaintiffs' second, third, and fourth causes of action, because "material factual issues are genuinely disputed."

Plaintiffs tried their remaining claims to the court without a jury in April 2002. Thir-

ty-three witnesses testified during the nine-day trial. After plaintiffs presented their case-in-chief, the superior court, on the state's motion, dismissed that part of plaintiffs' second cause of action which alleged that the state intentionally adopted a de jure race-based system of law enforcement that was allegedly operated in Alaska before Alaska became a state.[22] Following trial, the superior court issued a thirty-three page decision that thoroughly discussed the evidence and ruled in favor of the state on the plaintiffs' remaining claims. The court explained its reasoning in both its mid-trial oral findings and its extensive post-trial written decision containing its findings of fact and conclusions of law.[23]

Plaintiffs now appeal several of the superior court's rulings. They appeal Judge Hunt's June 7, 2000 order dismissing as plaintiffs the Alaska Inter–Tribal Council and the eight villages located within municipalities. They appeal Judge Gleason's December 4, 2001 order dismissing the Alaska Native Justice Center. They appeal Judge Gleason's February 13, 2002 grant of summary judgment to the state on the federal equal protection claim set out in their third cause of action (the disparate impact claim). Finally, they appeal Judge Gleason's post-trial decision and order granting judgment to the state on the federal equal protection claim set out in plaintiffs' second cause of action (the de jure claim) and the state equal protection claim set out in their fourth cause of action (the geographical discrimination claim).

## III. DISCUSSION

### A. Standard of Review

■■■ We review a grant of summary judgment de novo and will affirm the ruling

---

against them in the provision of an important or fundamental right in comparison to the police protection provided to residents of on-road communities by the Alaska State Troopers, and accordingly violates Plaintiffs' rights to Equal Protection of the law under the Fourteenth Amendment to the United States Constitution and Article I, §§ 1, 3, and 7 of the Alaska Constitution.

**21.** Plaintiffs have not appealed the superior court's rejection of their substantive due process claims.

**22.** Alaska became a state on January 3, 1959, when President Eisenhower signed the Statehood Proclamation. Proclamation No. 3269, 3 C.F.R., 1959–1963 Comp. p. 4–5 (Jan. 3, 1959).

**23.** We attach as an Appendix to our opinion portions of the superior court's decision and order.

of the superior court if the record indicates that no genuine issues of material fact are in dispute and that the moving party is entitled to judgment as a matter of law.[24] We apply our independent judgment to questions of law and will "adopt the rule of law which is most persuasive in light of precedent, reason, and policy."[25]

■■■■ We apply the clearly erroneous standard of review to a trial court's findings of fact.[26] A finding of fact is clearly erroneous and will be reversed only if review of the entire record leaves us with a definite and firm conviction that a mistake has been made.[27]

## B. Initial Observations

The plaintiffs ultimately found their appellate arguments on two main propositions.

The first proposition is that the state's VPSO and VPO programs, which exist largely in predominantly Alaska Native off-road communities and whose officers have less law enforcement training and authority than Alaska State Troopers, show that the state operates a "race-based" system of law enforcement in rural Alaska. Thus, plaintiffs contend that significant disparities between troopers and VPSOs and VPOs in qualifications, experience, training, arms, equipment, salaries, benefits, working conditions, and authority "result in a lower level of police protection for off-road, predominately Native communities than the protection afforded by the Troopers to on-road predominately white communities." As to this first proposition, the superior court found that trooper allocation decisions are racially neutral, and that the VPO and VPSO programs are supple-

ments to and not substitutes for trooper law enforcement services.

The second proposition is that for purposes of allocating the troopers' law enforcement services, off-road and on-road communities are similarly situated. Thus, plaintiffs assert that despite some differences between on-road and off-road places, "*all* Alaska communities, whether on or off the road grid, *are* similarly situated in the only two relevant ways—their basic need for and right to equal access to adequate police protection." (Emphasis in original.) As to this second proposition, the superior court ruled after trial that on-road and off-road communities are not similarly situated due to significant differences such as population and accessibility.

## C. Federal Equal Protection Claims

### 1. Introductory principles

■■■ A law that is race-neutral on its face nonetheless violates the Federal Equal Protection Clause if as applied it has a disparate impact on a racial group, and if that disparate impact "can be traced to a discriminatory purpose."[28] The plaintiffs conceded below and concede on appeal that "the statutes and regulations governing the allocation of certified and uncertified police are racially neutral."[29] Therefore, given their concession of the laws' facial neutrality, to prevail on their federal equal protection claim, plaintiffs had to show both that (1) as applied, the statutes and regulations controlling the allocation of law enforcement services in Alaska disproportionately and negatively impact Alaska Natives in their receipt of law enforcement services, and that (2) this disproportionate impact stems from an intent to discriminate against Alaska Natives in the

**24.** *Spindle v. Sisters of Providence in Washington,* 61 P.3d 431, 436 (Alaska 2002); *Ganz v. Alaska Airlines, Inc.,* 963 P.2d 1015, 1017 (Alaska 1998).

**25.** *Ganz,* 963 P.2d at 1017.

**26.** *Vezey v. Green,* 35 P.3d 14, 19–20 (Alaska 2001).

**27.** *Erica A. v. State, Dep't of Health & Soc. Servs.,* 66 P.3d 1, 6 (Alaska 2003); *Kelly v. Joseph,* 46 P.3d 1014, 1017 (Alaska 2002); *Vezey,* 35 P.3d at 20. Federal courts have taken the same approach. *E.g., Plumber, Steamfitter & Shipfitter Indus. Pension Plan & Trust v. Siemens Bldg. Techs. Inc.,* 228 F.3d 964, 968 (9th Cir.2000);

*United States v. Allinger,* 275 F.2d 421, 424 (6th Cir.1960).

**28.** *Pers. Adm'r v. Feeney,* 442 U.S. 256, 273–74, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

**29.** The parties' briefs on this issue do not discuss the statutes and regulations that describe how the state allocates law enforcement services, including services provided by those certified police officers.

allocation of law enforcement services. Absent a discriminatory purpose, a law that is race-neutral on its face does not violate the Federal Equal Protection Clause, even if the impact is disparate.[30]

Our inquiry here focuses on the second element, the requirement that a claimant establish discriminatory purpose or intent. We first address the plaintiffs' claim that the current police allocation system is traceable to a prior de jure discriminatory system. In some cases, neutral policies traceable to a prior de jure discriminatory system can, in essence, serve as a proxy for discriminatory intent attributable to the challenged policies (on the theory that the past system has not been sufficiently dismantled).[31] We conclude below that the superior court did not err in holding that the present system is not traceable to a prior de jure discriminatory system of law enforcement. Plaintiffs additionally argue that the evidence presented at the summary judgment stage and at trial established a discriminatory purpose or intent attributable to the present system. Because we conclude that plaintiffs failed to demonstrate a discriminatory purpose and therefore cannot succeed on their federal equal protection claim, we affirm the superior court's dismissal of this claim.

## 2. Whether the state's law enforcement allocation system is traceable to a prior de jure discriminatory system

■ Invoking *United States v. Fordice*,[32] plaintiffs contend that the state's present system of allocating law enforcement services is traceable to a prior de jure discriminatory system.[33] The parties refer to this as plaintiffs' *Fordice* claim. *Fordice* offers significant litigation benefits to a plaintiff who shows that present policies are traceable to a prior de jure system, because it relieves the plaintiff of having to prove that a discriminatory purpose can be attributed to the defendant's actions.[34]

After trial, the superior court found that the State of Alaska, when creating its law enforcement system after statehood, did not adopt an allegedly de jure discriminatory pre-statehood law enforcement system (i.e., the former Indian Police program operated by the federal government or any other pre-statehood program). The court also found that the state did not establish its own de jure discriminatory system. The court therefore rejected plaintiffs' equal protection theory that the state's law enforcement system is traceable to a prior de jure discriminatory system.

### a. *United States v. Fordice*

In *Fordice*, the United States Supreme Court considered whether Mississippi had satisfied its obligation under *Brown v. Board of Education*[35] to dismantle de jure segregation in its public university system.[36] Mississippi acknowledged that its laws formerly mandated a segregated, dual educational sys-

**30.** *See City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003).

**31.** *United States v. Fordice*, 505 U.S. 717, 731–32, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) ("Such policies run afoul of the Equal Protection Clause, even though the State has ... established racially neutral policies not animated by a discriminatory purpose.").

**32.** *United States v. Fordice*, 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) (holding that Mississippi had not sufficiently dismantled its prior de jure segregative university system even though it had implemented race-neutral policies).

**33.** Plaintiffs' second cause of action asserted that the state either intentionally adopted "the territorial government's de jure race-based dual system of law enforcement" or intentionally used race in

designing "its own de jure race-based dual system," and that it continues to operate such a system.

Their briefs do not discuss any relevant possible differences between the federal and state equal protection guarantees, and in discussing the *Fordice* claim, the superior court referred only to the Federal, and not the Alaska, Constitution. We assume that a successful *Fordice* claim would establish an equal protection violation under both constitutions. *See infra* note 63.

**34.** *Fordice*, 505 U.S. at 733 n. 8, 112 S.Ct. 2727.

**35.** *Brown v. Bd. of Educ.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*); *Brown v. Bd. of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*).

**36.** *Fordice*, 505 U.S. at 721, 112 S.Ct. 2727.

tem, but argued that it had reached full compliance with the law and had eliminated its prior de jure system.[37]

The Court determined that merely dismantling a de jure segregated admissions policy was insufficient to eliminate a prior de jure segregated dual educational system.[38] The Court explained:

> [A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* system that continue to foster segregation. Thus we have consistently asked whether existing racial identifiability is attributable to the State ... and examined a wide range of factors to determine whether the State has perpetuated its formerly *de jure* segregation in any facet of its institutional system.[39]

*Fordice* does not require a showing of present intent to discriminate if a claimant can show that the current system is "traceable" to a prior de jure system.[40] Given the difficulty of proving discriminatory intent,[41] this benefit may be important in a given case. As the Court noted, "if challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles."[42]

### b. Applicability of *Fordice*

In weighing the state's argument that *Fordice* does not apply to this case, we first consider whether it matters that there was a genuine factual dispute about whether there was a de jure race-based system of law enforcement in Alaska before statehood. It was undisputed in *Fordice* that Mississippi previously had officially operated a racially segregated university system. The dispute in *Fordice* was whether Mississippi had dismantled its prior system. But here there was no prior determination that law enforcement in the decades before Alaska statehood was de jure race-based,[43] and the evidence is not so one-sided that we must hold as a matter of law that the federal government or the Territory of Alaska operated de jure race-based law enforcement programs in Alaska in the years before statehood. The plaintiffs contend on appeal that evidence of a race-based dual system of law enforcement is undisputed. To the contrary, we think the evidence is in dispute and that the plaintiffs overstate their case. The burden-shifting discussed in *Fordice* does not apply if the predecessor program was not de jure discriminatory.

There is a second impediment to applying *Fordice* here. The State of Alaska did not operate the pre-statehood programs to which plaintiffs would trace the origins of the state's present system. Plaintiffs have not persuaded us that pre-statehood programs conducted by the federal or territorial governments should be treated as though the State of Alaska operated them. These are distinct governmental entities. The text of *Fordice* repeatedly refers to the State of Mississippi's prior system,[44] implying that tracing requires that the present government have purposefully discriminated in the past. This would be a logical requirement, because de jure discrimination requires an intent to

---

**37.** *Id.* at 723, 112 S.Ct. 2727.

**38.** *Id.* at 729, 112 S.Ct. 2727.

**39.** *Id.* at 728, 112 S.Ct. 2727 (internal citations omitted).

**40.** *Id.* at 733 n. 8, 112 S.Ct. 2727.

**41.** *See Sengupta v. Univ. of Alaska,* 21 P.3d 1240, 1258 (Alaska 2001); *see also Haroldsen v. Omni Enters., Inc.,* 901 P.2d 426, 431 (Alaska 1995); *Johnson v. Alaska State Dep't of Fish & Game,* 836 P.2d 896, 909 n. 22 (Alaska 1991). For a federal example see *Wise v. Mead Corp.,* 614 F.Supp. 1131, 1134 (D.Ga.1985).

**42.** *Fordice,* 505 U.S. at 732 n. 6, 112 S.Ct. 2727.

**43.** The superior court did not find that the pre-statehood law enforcement system was race-based. Its findings imply that it thought the long-defunct federal Indian Police program would have been unconstitutionally race-based if it had not been conducted by the United States, whose trust relationship with Indians is unique. But that program had been abandoned by the federal government long before statehood.

**44.** *See, e.g., Fordice,* 505 U.S. at 728, 112 S.Ct. 2727.

discriminate.[45] The analytical benefit *Fordice* confers makes sense in context of a state program challenged on the theory it is traceable to the state's prior, intentionally discriminatory program. In effect, *Fordice* shifts the burden to the state to prove that the discriminatory intent it previously held no longer exists. But placing that burden on a government is unwarranted if it was a different government that previously harbored the discriminatory intent.[46] We do not read *Fordice* to reach so far. Another Supreme Court decision implies that this burden-shifting is justified by the state's ability to explain that its actions were not motivated by segregative intent.[47] This rationale would not apply to intentions previously motivating a different government.

There is a third problem with applying *Fordice* here. *Fordice* concerned a state's educational system. As one court has noted, *Fordice* has not been applied outside the context of education.[48] We cannot say whether the Supreme Court would distinguish between educational programs and law enforcement services per se. But we perceive legally significant differences between programs that are ineluctably shaped by the physical realities of transportation, time, distance, and weather, and programs that can be readily and subtly molded by political choice hiding discriminatory intentions. The Court in *Fordice* seemed to acknowledge that student attendance could be affected by many factors other than state policies; the Court seemed to distinguish between race-

neutral factors and factors that might still be affected by the state's policy choices.[49] It also required that policies traceable to the de jure system "must be reformed to the extent practicable and consistent with sound educational practices."[50] The majority opinion noted that if traceable policies "are without sound educational justification and can be practicably eliminated," the state has not proved that it dismantled its prior system.[51] These passages remind us that factors that are inherently race-neutral are distinguishable from factors more easily influenced by policy. We think that decisions to post Alaska State Troopers in places that are on the road system or in places that are transportation hubs are materially different in character from those made by Mississippi in operating its post-secondary education system.

We conclude that the *Fordice* traceability analysis does not apply here, and that a violation of federal equal protection can only be shown "under traditional principles."[52] Because the trooper allocation statutes and regulations are facially race-neutral, these "traditional principles" dictate that, in order to succeed on that claim, plaintiffs must show a government intent to discriminate.[53]

### 3. Whether it was clear error after trial to reject plaintiffs' claim that the state intentionally adopted or designed a discriminatory system

■ Even though *Fordice* does not apply, evidence of pre-statehood practices and the

**45.** *Id.* at 733 n. 8, 112 S.Ct. 2727.

**46.** The Indian Police program was apparently in effect from about 1885 to 1907. Even though Alaska as of 1907 could send a non-voting delegate to Congress, it had no legislative or district-wide self-government. Alaska Delegate Act, ch.2083, 34 Stat. 170 (1906). Its laws had been adopted by Congress. *See, e.g.,* District Organic Act, ch. 53, 23 Stat. 24 (1884). Alaska formally became a territory and gained limited self-government in 1912. Territorial Organic Act, ch. 387, 37 Stat. 512 (1912). Alaska became a state on January 3, 1959. *See supra* note 22.

**47.** *Keyes v. Sch. Dist. No. 1, Denver, Colo.,* 413 U.S. 189, 210, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

**48.** *Johnson v. De Soto Bd. of County Comm'rs,* 204 F.3d 1335, 1344 n. 18 (11th Cir.2000) (noting that "no court has applied *Fordice* outside of

the education setting" and refusing to apply *Fordice* in Voting Rights Act challenge to electoral system).

**49.** *Fordice,* 505 U.S. at 729, 112 S.Ct. 2727.

**50.** *Id.*

**51.** *Id.* at 731, 112 S.Ct. 2727.

**52.** *Id.* at 732 n. 6, 733 n. 8, 112 S.Ct. 2727.

**53.** *Pers. Adm'r v. Feeney,* 442 U.S. 256, 273–74, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

origins of the state's present system remains relevant to equal protection analysis of plaintiffs' third cause of action (claiming racial discrimination) under "traditional principles."[54] Intent to discriminate may be proved by circumstantial evidence[55] and "historical background ... is one evidentiary source" in determining the existence of discriminatory purpose, "particularly if it reveals a series of official actions taken for invidious purposes."[56]

The superior court allowed plaintiffs to proceed to trial with their state law claim that the state intentionally used race in designing its own system of law enforcement. After trial, the superior court ruled against plaintiffs on this claim, ultimately finding that plaintiffs had "not established that in creating the VPSO program, or in creating any predecessors to that program, the State established a system of law enforcement in which a person's race or a community's racial composition were determinative factors in the type of law enforcement services to be provided."

For purposes of our analysis here, we assume that before Alaska became a state, law enforcement services provided in Alaska by the federal government were race-based. The superior court found that when it was in effect, the Indian Police program operated by the federal government before statehood was a "race-based system of law enforcement." The court seems to have found that the program ended in 1907, but that equivalent federal programs may have continued into the 1930s. The court, however, citing the federal government's trust responsibility to Indians, made no finding that the federal race-based programs constituted illegal discrimination. The court did find that there was no evidence that a post-Indian Police and pre-statehood U.S. Marshals program was explicitly race-based and also found that plaintiffs had not proved their claim that the

state adopted the pre-statehood Indian Police program following statehood. We do not need to decide whether the federal programs were also programs of the Territory of Alaska, because the ultimate questions are whether the State of Alaska intentionally created, and is presently operating, a discriminatory system. As the superior court observed mid-trial, the evidence on these questions was circumstantial.

Much of the trial court evidence at the core of the plaintiffs' claims of an intentionally discriminatory system of law enforcement related to whether the state's current VPSO and VPO programs are "traceable" to a pre-statehood system. Plaintiffs regard programs such as the VPSO program as state-sponsored substitutes for law enforcement by full-fledged police officers, and interpret evidence about the creation of these programs as revealing an intention to discriminate against Alaska Natives and residents of remote communities. They argued below that the Supreme Court's use of words such as "traceable" and "derived" in *Fordice* indicates that *Fordice* does "not necessarily requir[e] ... an absolute lineup of causality from earlier programs to later ones."[57] They then argued that "a single model of a segregated system" for providing law enforcement services has existed in Alaska since the 1800s. They distinguished the VPSO program from a mere desire to hire Alaska Natives as state troopers. They argued that the state is "creating entirely separate programs to provide what are basically the same government services and constructing those separate programs in racial terms which was the model that had been set out with the Indian police."

The state asserts on appeal that these programs (1) do not discriminate against Alaska Natives; (2) increase the quality of law enforcement and other public safety measures in the villages; and (3) supplement

---

**54.** *Fordice*, 505 U.S. at 732 n. 6, 112 S.Ct. 2727.

**55.** *Sengupta*, 21 P.3d at 1258; *see also Era Aviation, Inc. v. Lindfors*, 17 P.3d 40, 43–44 (Alaska 2000).

**56.** *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555.

**57.** As we saw above, even though the *Fordice* traceability analysis does not apply here, evidence of the origins of the state's present system remains relevant under "traditional principles." *Fordice*, 505 U.S. at 732 n. 6, 112 S.Ct. 2727.

law enforcement provided by full-fledged police officers.

After prompting from the superior court, the plaintiffs conceded at trial that there were no "documents where [the state] specifically said ... we had this Indian police model a few decades ago, why don't we replicate it." The plaintiffs argued at trial that the VPSO program was traceable to the Indian Police program because of what they called "numerous similarities" between the programs. They emphasized that in both programs, non-Native superiors directed the Native law enforcement officers, there was a regional hub system, and the officers had limited authority. The plaintiffs argued that law enforcement in Alaska has "been tinkered with over time," but that "it's basically the identical system." In response to the superior court's questions about any evidence of "the link between the Indian police and the marshals and the state programs that were developed after statehood," counsel for the plaintiffs responded that "all we have ... on that is circumstantial evidence."

The evidence shows that there are many differences, as well as similarities, between the Indian Police and the VPSOs. The Indian Police were "clothed, paid and guided by military and territorial authorities" and the VPSOs are "clothed and guided" by the Alaska State Troopers. The Indian Police wore and the VPSOs wear unique, government-provided uniforms. The Indian Police were paid from different funding sources within the federal government, including the Bureau of Indian Affairs and the Treasury Department. The VPSOs are paid with state funds that pass through Native regional nonprofit corporations. There was evidence the duties of the Indian Police were defined by the territorial governor. The VPSOs are guided by the troopers in law enforcement matters, and by the nonprofit corporations in all other matters. The Indian Police were exclusively composed of Alaska Native officers. There is no ethnicity requirement to become a VPSO, and there are non-Native VPSOs.[58]

The subjects of law enforcement by the Indian Police were exclusively Alaska Natives. There is no racial or ethnic jurisdictional restriction on VPSOs,[59] although almost all VPSOs are stationed in places that have a population that is majority-Native. The Indian Police provided only law enforcement. VPSOs are trained in and provide, among other services, law enforcement, search and rescue, emergency medical treatment, fire safety, and water and boating safety.

Based on this evidence, the superior court found in its oral findings at the end of plaintiffs' case-in-chief and again in its written findings after trial that the VPSO program was not traceable to the pre-statehood Indian Police program. The superior court emphasized the "considerably broader duties" VPSOs have as compared to the duties of the Indian Police. It noted that while membership in the Indian Police was limited to Alaska Natives, the VPSO program has no ethnic or racial requirement for entry. It also explained that some VPSOs are stationed in places where the majority of the population is non-Native, while Indian Police could only legally serve in predominantly Native communities. The court found that "the establishment of the VPSO program was based on the advice of knowledgeable people in the field of law enforcement and ... was not an effort by the State of Alaska to resurrect an old model that had been in place from the late 1800s to early 1900."

The record convinces us that the superior court did not clearly err in finding that the state did not adopt the federal government's pre-statehood de jure race-based Indian Police program. Credible evidence supports the superior court's findings.

We also conclude that the superior court did not err in rejecting plaintiffs' claim that the present system is "traceable" to post-statehood race-based antecedents. Plaintiffs contend that the superior court altogether failed to address this issue. Although the court's written decision did not expressly find that the present system was not traceable to

---

58. *See* 13 AAC 96.080 (2002) (setting out criteria for hire as VPSO). There is no ethnicity requirement for VPOs, either. *See* 13 AAC 89.010 (2002) (setting out criteria for hire as VPO).

59. AS 18.65.670(a) provides in part that VPSOs shall "administer functions relative to (1) the protection of life and property in rural areas of the state."

an earlier *state* system, it expressly rejected the factual underpinnings for plaintiffs' claim of traceability. Having noted the traceability claim and then made its findings, the superior court at least implicitly addressed the issue. We therefore discern no analytical error on the superior court's part. And because we concluded above that *Fordice* does not apply to this case, the traceability issue has no special importance. To establish a discriminatory purpose in this case, plaintiffs had to demonstrate that the State of Alaska was motivated by discriminatory intent in creating a race-based system. Plaintiffs could not rely on intent attributable to federal or territorial officials. The traceability issue was therefore subsumed in plaintiffs' efforts to prove that the state was motivated by an intention to discriminate. The superior court considered the evidence potentially probative of that claim, and discussed much of it in detail in explaining why it was ruling against the plaintiffs.

Because the superior court's findings are not clearly erroneous, we conclude that the historical evidence does not prove the existence of a discriminatory intent on the state's part, especially since no "series of official actions taken for invidious purposes" has been revealed.[60]

### 4. Whether it was reversible error to dismiss the federal racial discrimination claim on summary judgment

■ In granting summary judgment to the state on the federal equal protection claim asserted in plaintiffs' third cause of action, the superior court concluded that the plaintiffs "have not offered evidence that any disparate impact of the admittedly facially-neutral standards for allocating certified police officers arises from an actual present intent to discriminate against Alaska Natives." Plaintiffs argue on appeal that they submitted "abundant, uncontradicted evidence proving precisely to the contrary." They contend that, given "the uncontradicted record" and "undisputed facts," we should rule as a matter of law for the plaintiffs on this claim.

The state denies any intent to discriminate against Alaska Natives in allocating law enforcement services. It contends that the plaintiffs conceded "more than once" that state officials "bore no discriminatory intent and were operating with the best of intentions."

■ To be entitled to summary judgment, a movant must demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.[61]

Plaintiffs' contention that the evidence supporting this claim is "undisputed" or "uncontradicted" is unwarranted. Most of the evidence they rely on was also offered at trial to support their state law claim that the state intentionally discriminates against Alaska Natives in allocating law enforcement services. Plaintiffs primarily rely on what they say is evidence of past discriminatory intent and the adoption or establishment of a system of allocating law enforcement services that discriminates based on race. But as the superior court observed, the contentions of past discrimination and the adoption or establishment of a discriminatory system form the basis for the plaintiffs' *second* cause of action—their *Fordice*-based claim that the state intentionally adopted or established a prior de jure race-based system for allocating law enforcement services and continues to operate that allegedly race-based dual system. Plaintiffs proceeded to trial on that cause of action, and lost, so it cannot be said that the evidence of historical discriminatory intent is undisputed.

Plaintiffs' claim necessarily rests on the theory that the state relied on the availability of VPOs and VPSOs in deciding where to station troopers. They assume that if there were no VPOs or VPSOs, the state would allocate trooper services more favorably to Alaska Native villages. But if the allocation of trooper services is not discriminatory in the first place, the Equal Protection Clause would not entitle plaintiffs to a more favorable allocation of trooper services. There was evidence at trial that in allocating troop-

---

**60.** *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555.

**61.** Alaska R. Civ. P. 56(c); *Kollodge v. State,* 757 P.2d 1028, 1031–32 (Alaska 1988).

er services, the state did not rely on the availability of VPOs or VPSOs to alter trooper assignments. The superior court found that the VPO and VPSO programs were supplements to, rather than substitutes for, trooper services. Likewise, plaintiffs' contention that there is a "dual system" of law enforcement assumes that the state treats VPOs and VPSOs as alternatives to troopers. But credible evidence to the contrary supports the trial court's post-trial findings that those programs supplement the troopers and are not meant to be substitutes for trooper services.

Plaintiffs' contentions ultimately also turn on evidence that the response times of troopers to incidents in Native villages, most of which are not accessible to the troopers by road from their hub posts, are greater than in locations on the road system. But those differences would not be legally significant for equal protection purposes unless the villages are similarly situated to on-road communities. The superior court's post-trial decision found that they are not.

We therefore reject plaintiffs' contention that the evidence was so compelling that they were entitled to judgment as a matter of law on this federal claim.

We recognize that when summary judgment was granted to the state on this claim, some evidence potentially supported the dismissed claim. Glenn Godfrey, then Director of the Division of Alaska State Troopers, stated in an affidavit that decisions about trooper location are not and have never been made "because of the racial, ethnic or cultural make-up of the community." But he also explained that trooper allocation decisions are based on

> the need for the position, the funding available to the division, *the availability of other law enforcement services,* the geographic location and transportation and communication services in communities, and the ability of positions to be mobile and flexible so as to provide assistance to other areas of the state if needed.

(Emphasis added.) The emphasized reference could arguably be read in isolation, at least at the summary judgment stage, to imply that VPSOs were treated as providing substitute law enforcement services in Native villages and that the state took VPSO availability into account when it allocated trooper law enforcement services. The frailty of the probative value of this isolated reference would normally render it insufficient to create a genuine factual dispute, but given the extreme difficulty of proving discriminatory intent [62] it would arguably be sufficient in this case.

Nonetheless, the superior court's rejection of the identical state racial discrimination claim after trial makes it unnecessary to decide whether it was error to grant summary judgment to the state on the federal claim asserted in the third cause of action. The Alaska Constitution's guarantee of equal protection is at least as protective as the Federal Constitution's corresponding guarantee.[63] The superior court's rejection of plain-

---

**62.** Commentators have noted that there is "a broad consensus that discrimination today is generally perpetrated through subtle rather than overt acts." Michael Selmi, *Proving Intentional Discrimination: The Reality of the Supreme Court Rhetoric,* 86 Geo. L.J. 279, 284 (1997). It may even be unconscious. Charles R. Lawrence, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan. L.Rev. 317, 322 (1987). Government officials will almost never openly avow a discriminatory intent and they can usually express a benign purpose for a statute or policy. Erwin Chemerinsky, Constitutional Law: Principles and Policies 567 (1997).

**63.** See *Stanek v. Kenai Peninsula Borough,* 81 P.3d 268, 272 (Alaska 2003) ("[A]nalysis of equal protection claims under the federal constitution is, if anything, more forgiving than the approach we use under the Equal Rights Clause of the

Alaska Constitution...."). See also *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.,* 28 P.3d 904, 909 (Alaska 2001) ("Alaska's constitutional equal protection clause ... protects Alaskans' right to non-discriminatory treatment more robustly than does the federal equal protection clause."); *Williams v. State, Dep't of Revenue,* 895 P.2d 99, 103 (Alaska 1995) ("Alaska's equal protection clause may be more protective of individual rights than the federal equal protection clause."); *Gilmore v. Alaska Workers' Comp. Bd.,* 882 P.2d 922, 926 (Alaska 1994) (same); *State, Dep't of Revenue, Permanent Fund Dividend Div. v. Cosio,* 858 P.2d 621, 629 (Alaska 1993) ("Minimal scrutiny under our state constitution may be more demanding than under the federal constitution."); *State v. Anthony,* 810 P.2d 155, 157 (Alaska 1991) ("Alaska's equal protection clause is more protective of individual

tiffs' state claim after a trial on the merits establishes the harmlessness of any possible error in granting summary judgment to the state on the identical federal claim.[64] Plaintiffs do not contend that they might have offered any additional evidence had the federal claim gone to trial, or that a different standard would have permitted them to succeed on their federal claim at trial even though they did not prevail on their state claim. Granting summary judgment on that claim therefore did not prejudice plaintiffs.[65]

### 5. Whether it was error not to shift the burden of persuasion to the state.

██ Plaintiffs also contend that because they established a prima facie case of racial discrimination, it was error not to impose the burden of persuasion on the state.[66] They rely on two United States Supreme Court school segregation decisions to support their contention that the superior court should have put the burden on the state to justify its conduct. In *Swann v. Charlotte–Mecklenburg Board of Education*, the Court explained that

> where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown.[67]

In *Keyes v. School District No. 1, Denver, Colorado*, the Court identified this quotation from *Swann* as defining a "history of segregation." [68] The Court explained in *Keyes* that once a plaintiff has made out a prima facie case of a violation of substantive constitutional rights, the burden shifts to the state to justify its conduct.[69] To satisfy that burden, the Court said that "it is not enough ... that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions." [70] Plaintiffs rely on *Keyes*'s statement that "a finding of intentionally segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schools within the system are not adventitious." [71]

The plaintiffs argue that they made out a prima facie showing of a violation of substantive constitutional rights because they demonstrated a history of segregation in the provision of law enforcement services in Alaska, and because today it is still "easy to distinguish those law enforcement programs intended for Native communities from those intended for non-Native communities." They argue that "the vast majority of VPSOs are Native" [72] and that troopers have better equipment, more training, and greater authority than VPSOs.

rights than the federal equal protection clause."); *Sonneman v. Knight*, 790 P.2d 702, 706 (Alaska 1990) ("[T]he federal equal protection clause is, if anything, less protective of individual rights than the state equal protection clause....").

64. *Cf. Coulson v. Marsh & McLennan, Inc.*, 973 P.2d 1142, 1149 (Alaska 1999) (holding that any error in granting summary judgment to one defendant was rendered harmless by jury's finding after trial that defendant's purported agent was not liable for torts claimed).

65. *See Alvarez v. Ketchikan Gateway Borough*, 91 P.3d 289, 296 (Alaska App.2004) (holding that "even if [the trial court] had erred in ruling that [defendant] had failed to establish a prima facie case of racial discrimination, that error would be harmless because [defendant] was allowed to fully litigate her claim").

66. Plaintiffs apparently intend to apply this argument to both the trial and summary judgment portions of the proceedings below.

67. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

68. *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

69. *Id.* at 209–11, 93 S.Ct. 2686.

70. *Id.* at 210, 93 S.Ct. 2686.

71. *Id.* at 208, 93 S.Ct. 2686.

72. The plaintiffs cite a 1991 report indicating that approximately thirty percent of VPSOs were not Native.

The state responds by arguing that under *Keyes*, the burden-shifting only occurs if the government has engaged in *intentional* segregation.[73] It contends that the State of Alaska has not intentionally discriminated against Alaska Natives in providing law enforcement services. The state also argues that *Keyes* does not apply to the present fact scenario: "To compare the state's allocation of law enforcement resources to a 'practice of concentrating Negroes in certain schools' is not only misplaced, it is ludicrous."[74]

Plaintiffs are incorrect in assuming that they made out a prima facie case of discrimination based on race. For the reasons we discussed above in Parts III.B.2 and 3, any pre-statehood discriminatory intentions motivating the federal government in implementing the old Indian Police program or other pre-statehood federal programs are not to be attributed to the State of Alaska. And given the facial neutrality of the state laws and policies that govern the activity that is at the core of this case—the allocation of trooper services—plaintiffs did not make out a prima facie case of racial discrimination by the state. We therefore conclude that the burden-shifting discussed in *Keyes* does not apply. The superior court did not err by failing to shift the burden to the state.

### 6. Whether the superior court applied the wrong intent standard

Plaintiffs also contend that the superior court committed legal error by adopting the state's "three-part test" for determining whether law enforcement was racially based.[75] But we do not read the court's decision as adopting a "three-part test"; the cited passage of the court's post-trial findings simply discusses evidence that supports the superior court's ultimate conclusion that the state did not create a race-based system of law enforcement. The court was there permissibly distinguishing the VPSO program from the pre-statehood federal programs on which plaintiffs relied in attempting to prove their de jure claim.

Plaintiffs also argue that it was error for the superior court in Paragraph 111 of its post-trial decision to require plaintiffs to show that race was a "determinative factor" for the state's action. The superior court, addressing the VPSO program, there concluded: "But Plaintiffs have not established that in creating the VPSO program, or in creating any predecessors to that program, the State established a system of law enforcement in which a person's race or a community's racial composition were *determinative factors* in the type of law enforcement services to be provided." (Emphasis added.)

Citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,[76] the plaintiffs argue that they only needed to prove that a discriminatory purpose was a "motivating factor," not a "determinative factor." The state responds that the plaintiffs did not prove that race was even a motivating factor in the state's development of its law enforcement programs.

The Supreme Court explained in *Personnel Administrator v. Feeney* that even though race does not have to be the determinative factor in a governmental decision for a court to find discriminatory intent, the government must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[77] We conclude that although it would have been error to apply the determinative factor standard to the ultimate question—whether the allocation of law enforcement services by the troopers was racially motivated—any possible error here was harmless because plaintiffs failed to prove intent under the

---

73. *Keyes*, 413 U.S. at 208, 93 S.Ct. 2686.

74. Appellees' Brief at 46 n. 43 (quoting *Keyes*, 413 U.S. at 201, 93 S.Ct. 2686).

75. We again assume that plaintiffs intend this argument to apply to the superior court's rulings both on summary judgment and after trial.

76. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

77. *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *see also McCleskey v. Kemp*, 481 U.S. 279, 298, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

correct standard. That VPSO services were mainly available in off-road communities that were predominantly Alaska Native does not establish that the allocation of trooper services was racially motivated. It simply reflects demographic reality in Alaska, as do the comments of the creators of the VPO and VPSO programs. Recognition by thoughtful state officials that Alaska Natives are the dominant demographic group residing in rural Alaska, and would be most of the recipients of the proposed supplemental law enforcement services, does not prove that race was a motivation for their decisions. Nor does it prove that they sought to develop a dual law enforcement system, much less that they wished to provide separate and substitute law enforcement services in off-road communities. Instead, the evidence permits a logical conclusion that the state developed its system of rural law enforcement based on financial and geographical constraints, and an evaluation of crime rates in those locations.

Likewise, we are unpersuaded by plaintiffs' assertion that the superior court erred in assuming that the plaintiffs were required to show that state officials acted on the basis of "hostility or racial disfavor toward Alaska Natives" in order to show intentional racial discrimination. They base this argument on their contention that "uncontradicted evidence" shows that the state "intentionally operates separate policing programs for Native villages." That Native villages are the primary beneficiaries of the VPO and VPSO programs does not compel a conclusion that the state intends to discriminate against Native villages; it only establishes that villages with those programs are provided services that other communities do not receive. The real question here is whether the state's allocation of law enforcement services by APSC-certified police officers was motivated by a discriminatory purpose. As to that question, the evidence produced at trial does not establish that the superior court clearly erred in finding that it was not.

### D. State–Based Equal Protection Claim Alleging Discrimination Against Off–Road Communities in Providing Police Protection

■ Plaintiffs' fourth cause of action asserted an equal protection violation based on allegations that the state, in providing police protection, treats residents of off-road communities less favorably than residents of on-road communities.[78] We assume with respect to this "geographic discrimination" claim that, as plaintiffs contend and the superior court concluded, police protection is an "important right" for purposes of equal protection analysis. Following trial, the superior court concluded that plaintiffs "have not proven that the State's existing system of allocating trooper resources deprives them of law enforcement services that are provided to similarly situated Alaskans." [79]

Plaintiffs contend that it was error to reject their geographic discrimination claim at trial. Most of their appellate argument addresses the issue of disparate treatment and the analysis required after disparate treatment is found. They contend that the superior court erred in finding that police protection in off-road communities was equal or superior to that in on-road communities. Although the state's appellate brief discusses the disparate treatment issue, it also argues that plaintiffs failed to prove that the "comparison groups" were similarly situated and that plaintiffs "failed to meet their threshold burden of proving similarly situated classes and systematic deprivation."

■ In considering state equal protection claims based on the denial of an important right we ordinarily must decide first whether similarly situated groups are being treated differently.[80] If they are, we apply a sliding scale of scrutiny to the challenged

---

**78.** Footnote 20 sets out the fourth cause of action.

**79.** The fourth cause of action claimed both federal and state equal protection violations. The superior court granted summary judgment to the state as to the federal claim. Plaintiffs tried their state "geographic discrimination" claim. They do not argue on appeal that it was error to dismiss their corresponding federal claim on summary judgment.

**80.** *Stanek v. Kenai Peninsula Borough,* 81 P.3d 268, 270 (Alaska 2003).

practice.[81] In conducting that analysis, we first determine the importance of the constitutional right at stake.[82] This is "the most important variable" in determining the applicable level of scrutiny.[83] We then examine the state's interests.[84] These interests may range from merely legitimate to compelling, depending on the burden that the challenged regulation places on the exercise of constitutional rights.[85] Finally, we consider the means the state uses to advance its interests.[86] Depending on the importance of the right involved, the means-to-ends fit may range from a substantial relationship, at the low end of the sliding scale, to the least restrictive means available to achieve that interest at the highest end of the scale.[87]

■ But in "clear cases" we have sometimes applied "in shorthand the analysis traditionally used in our equal protection jurisprudence." [88] If it is clear that two classes are not similarly situated, this conclusion "necessarily implies that the different legal treatment of the two classes is justified by the differences between the two classes." [89] Whether two entities are similarly situated is generally a question of fact.[90]

The superior court found that plaintiffs failed to prove that the state's "existing system of allocating trooper resources deprives them of law enforcement services that are provided to similarly situated Alaskans." It appears that the superior court concluded that the comparisons the plaintiffs drew were fundamentally deficient. It found "significant differences between the Plaintiffs' home communities and many of the 'off-road' communities that Plaintiffs have characterized as 'places in the complaint.' " It noted the wide range in populations among the 165 places, the range of accessibility to nearby communities where APSC-certified police were stationed, and the presence or absence of VPSOs and VPOs in some of the places. Similarly; it also found that "[t]here are also significant differences among the 'on-road' communities ... to which Plaintiffs have compared the 'places in the complaint.' " The court again noted the wide range in populations of the communities on the road system, and the range in distance and accessibility to trooper posts. Because there was ample credible evidence to support them, these findings were not clearly erroneous.

**81.** *Id.; State v. Planned Parenthood of Alaska, Inc.,* 28 P.3d 904, 909 (Alaska 2001).

**82.** *Planned Parenthood,* 28 P.3d at 909; *Alaska Pac. Assurance Co. v. Brown,* 687 P.2d 264, 269 (Alaska 1984).

**83.** *Planned Parenthood,* 28 P.3d at 909 (quoting *Matanuska–Susitna Borough Sch. Dist. v. State,* 931 P.2d 391, 396 (Alaska 1997)).

**84.** *Brown,* 687 P.2d at 269.

**85.** *Planned Parenthood,* 28 P.3d at 909; *Brown,* 687 P.2d at 271.

**86.** *State v. Enserch Alaska Constr. Inc.,* 787 P.2d 624, 631–32 (Alaska 1989); *Brown,* 687 P.2d at 269.

**87.** *Enserch,* 787 P.2d at 631–32; *Brown,* 687 P.2d at 269–70.

**88.** *Lauth v. State,* 12 P.3d 181, 187 (Alaska 2000).

**89.** *Id.* (holding that "children with one economically secure parent who is providing for their care at least fifty percent of the time are not similarly situated with children having both parents economically eligible for benefits."). *See also Lawson v. Helmer,* 77 P.3d 724, 728 (Alaska 2003) (holding that civil defamation cases are dissimilar to criminal perjury cases); *Shearer v. Mundt,* 36 P.3d 1196, 1199 (Alaska 2001) (observing that attorney and non-attorney pro se litigants are not similarly situated); *Brandon v. Corr. Corp. of Am.,* 28 P.3d 269, 276 (Alaska 2001) (holding that indigent prisoners are not similarly situated to indigent non-prisoners); *Fairbanks North Star Borough Assessor's Office v. Golden Heart Utils., Inc.,* 13 P.3d 263, 273 (Alaska 2000) (holding that lessee of city's utilidor system was not similarly situated to lessees of floatplane slips); *Rutter v. State,* 963 P.2d 1007, 1013 (Alaska 1998) (holding that commercial fishers and sport fishers are not similarly situated); *Meek v. Unocal Corp.,* 914 P.2d 1276, 1281 (Alaska 1996) (holding that worker who "lived near his work place and did *not* receive room and board" was not similarly situated with a "remote site worker") (emphasis in original); *Shepherd v. State, Dep't of Fish & Game,* 897 P.2d 33, 44 (Alaska 1995) (holding that resident and nonresident recreational users of Alaska fish and game are not similarly situated); *Smith v. State, Dep't of Corr.,* 872 P.2d 1218, 1226 (Alaska 1994) (holding that discretionary and mandatory parolees are not similarly situated with respect to need for personal appearance hearing).

**90.** *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 n. 2 (2d Cir.2001).

The court also found that any discrepancies between the police protection received by off-road communities without local police and that provided by troopers to on-road communities "are due principally to the geographic isolation, weather conditions and transportation difficulties inherent in the location of many off-road communities...." This finding accurately identifies significant and relevant physical differences between on-road communities and off-road communities. These non-trivial differences are inconsistent with a claim that on-road and off-road communities are similarly situated in ways that are relevant here.

The plaintiffs argue that the superior court's findings on similarly-situatedness were limited. They claim that the superior court did not rule that the off-road and on-road communities were not similarly situated for equal protection purposes. They note that the superior court continued to conduct an equal protection analysis after making its findings on similarly-situatedness. They argue that the court would have had no reason to reach these issues if it had found that the off-road and on-road places were not similarly situated.

We do not infer from the superior court's willingness to address other issues that it thought it was not resolving the similarly situated issue. It appears that the court was diligently and commendably addressing all issues that might be subject to appeal. Its thorough findings and conclusions leave no doubt that it was ruling that plaintiffs did not prove that they are similarly situated to others allegedly being treated more favorably. There is no basis for thinking that the court reasoned that it was not necessary to decide the issue. It flagged the issue in denying summary judgment to the state, and noted it again in Paragraph 116 of its post-trial decision, where it referred to the issue as "[a] critical threshold inquiry."

The superior court's findings and conclusions permissibly distinguish on-road from off-road communities. The vast size of Detachment C, the geographical isolation of the off-road villages, the impossibility of traveling to them by road vehicle, and the greater susceptibility of non-road forms of transportation to the influences of weather, terrain, and distance all underscore the correctness of the superior court's findings on this issue. In other words, Alaska's physical realities dictate the result on this claim.

Plaintiffs claim that such differences would automatically justify all disparities "no matter how invidious" if the state prevails—but these differences are founded in physical reality; the state did not create them.[91] And although plaintiffs assert that the police protection the troopers provide must be reallocated, it is difficult to imagine how any reallocation could overcome the factors found by the superior court. Stationing a trooper in any given isolated village may give that village lower response times and benefit its residents, but will make it no easier for that trooper to reach other isolated communities and their residents as need requires.

The state cannot realistically post a trooper in every remote village, and indeed plaintiffs conceded below that this is constitutionally unnecessary. It is therefore inevitable that troopers must travel to communities and that their ability to respond in person depends on such neutral and physical considerations as weather, daylight, and distance, and whether the community is accessible by road vehicle, or whether some more problematic form of transportation must be used.

Plaintiffs argue that although there may be some differences between on-road and off-road places, "all Alaska communities, whether on or off the road grid, *are* similarly situated in the only two relevant ways—their basic need for and right to equal access to adequate police protection." (Emphasis in original.) They contend that if differences in

91. Although geography and weather may justify some differences in how the state provides law enforcement services in rural areas, this case does not require us to consider whether the state's policies in providing law enforcement services were so lacking in fairness with respect to residents of rural communities as to give rise to a plausible substantive due process claim. Plaintiffs pleaded federal and state substantive due process claims that were dismissed on summary judgment, but do not appeal from the dismissal of those claims.

size and isolation "rendered off-road residents dissimilar for equal protection purposes, rural residents would find themselves entirely outside of equal protection guarantees." But the physical dissimilarities here are directly relevant and material to the issue of how Alaska State Troopers are to provide on-location law enforcement services. These dissimilarities show that the superior court did not clearly err in finding that the two asserted similarities are not the relevant, much less the *only* relevant, points of comparison for determining the issue of similarly-situatedness.

### E. Standing of Dismissed Plaintiffs

Plaintiffs also argue that it was error to dismiss for lack of standing the claims of eight villages located in incorporated municipalities, and the claims of the Alaska Inter-Tribal Council and the Alaska Native Justice Center.

We do not need to consider the standing of these dismissed plaintiffs. We ruled above that the superior court did not err in rejecting the remaining plaintiffs' equal protection claims on their merits, and there has been no suggestion that the dismissed plaintiffs could have offered additional evidence that could have changed the outcome on any of the equal protection claims. The dismissed plaintiffs have not explained what additional arguments or evidence they would have raised at trial, and they made no offer of proof. The superior court allowed the remaining plaintiffs to present evidence about all villages in Alaska, and they indeed offered evidence at trial about villages that had been dismissed as plaintiffs.

Because the dismissed plaintiffs have not explained how their identical claims might have been resolved more favorably after trial, any possible error in dismissing them from the case was harmless.

## IV. CONCLUSION

We therefore AFFIRM the superior court's judgment.

### APPENDIX

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### THIRD JUDICIAL DISTRICT AT ANCHORAGE

ALASKA INTER–TRIBAL COUNCIL, et al., Plaintiffs,

v.

STATE OF ALASKA, et al., Defendants.

Case No. 3DI–99–00113 CI

*DECISION AND ORDER*

. . . .

10. In Detachment C, there are trooper hubs in Aniak, Bethel, Dillingham, Galena, King Salmon, Kodiak, Kotzebue, Nome, and St. Mary's, which all serve as transportation hubs for travel by air to the adjacent communities. The location of trooper posts within Detachment C is based upon several factors including the availability of transportation, the requirement to provide support to state courts, and the location of correctional facilities and jails.

11. The Bethel trooper post has a state-owned aircraft and a full-time civilian pilot. The troopers from Bethel also travel on commercial flights.

12. The Bethel troopers serve Akiachak, Tuluksak, Akiak and other communities in the area. The Bethel trooper post has a toll-free number for calls from outlying communities.

13. Other agencies, such as the State Department of Health and Human Services Division of Family and Youth Services, also serve outlying communities from Bethel. Bethel has a regional center for victims of domestic violence and sexual abuse, and a regional child advocacy center. An inhalant abuse center recently opened in Bethel, which serves Bethel and outlying communities.

14. Troopers from the Bethel post respond to domestic violence calls from outlying communities. Troopers from Bethel called to outlying communities due to reports of sexual abuse often bring the victim back to

Bethel with them for examination and follow-up investigation from the sexual abuse response team at the hospital in Bethel. Troopers also accompany social workers on crisis calls to outlying communities.

15. The availability of transportation and public health resources in Bethel supports the Department's decision to locate a trooper hub there.

16. The Aniak trooper post has a twin-engine airplane and pilot. When necessary, troopers from Aniak also serve Akiachak and Tuluksak.

17. Troopers from the Kotzebue post serve several other communities, including Kiana. Kotzebue troopers have a toll-free number for calls for service from outlying communities.

18. There are troopers stationed in Anchorage and Fairbanks who serve communities other than where they are stationed, since both Anchorage and Fairbanks have local police forces. The troopers are located in these communities because those urban areas are centers for communication, transportation, medical and other services and are surrounded by geographic areas over which the troopers have primary jurisdiction.

19. Some troopers located in hub communities are court service officers whose primary responsibility is to provide services to the court. In addition, troopers facilitate transfers of prisoners between state court and correctional facilities or jails.

20. Troopers assigned to rural posts are generally more experienced than troopers assigned to more densely populated areas.

21. The statewide allocation of troopers has shifted over time. The Alaska State Troopers have tended to protect the rural detachments from budget cuts. As a result, over the past decade the number of troopers in Detachments A, B, and E has been reduced while trooper staffing in Detachments C and D has increased. As of January 2002, the number of authorized commissioned officers in each detachment was as follows:

| Detachment Area | Trooper Served Population | Number of Troopers | Population per Trooper |
|---|---|---|---|
| A (Southeast) | 10,961 | 15 | 731 |
| B (Southcentral) | 52,365 | 40 | 1,309 |
| C (Western, Aleutian Chain, Kodiak Island) | 40,776 | 42 | 971 |
| D (Interior and Northern) | 62,832 | 57 | 1,102 |
| E (Kenai Peninsula) | 33,961 | 31 | 1,096 |
| **Statewide Totals** | **200,895** | **185** | **1,086** |

At trial, the Defendants indicated there were a total of 52 troopers assigned to Detachment C, which would result in one trooper for every 784 citizens in that detachment served by the AST. However, the 52 trooper figure included Regional Public Safety Officers and Anchorage-based troopers assigned to service the Detachment C region. *See* Exhibit T-6. The Defendants had indicated that there were a total of 42 troopers actually stationed in Detachment C, and that is the figure used in this chart. As a result, the above figures may understate the number of troopers per person for Detachment C in comparison to the ratio for the rest of the state. As the above chart indicates, according to the 2000 census, approximately 200,895 Alaskans live in areas over which the troopers have primary jurisdiction. This figure excludes all Alaskans who receive their pri-

mary law enforcement services from a local police force. There are 185 Alaska State Troopers of the rank of sergeant or below who are actively engaged in case investigation in the state. Therefore, the statewide per capita allocation of active law enforcement Alaska State Troopers is one trooper for every 1,086 residents. The 2000 census shows 70,760 Alaskans living in Detachment C, which includes Akiachak, Tuluksak, Akiak, Kiana, and Clark's Point. Certified police from municipal departments serve 29,984 Alaskans within Detachment C. Thus, the remaining 40,776 Alaskans in the Detachment C area are served by troopers. As of fiscal year 2002, a total of 42 troopers were actively engaged in case investigation in Detachment C, creating a ratio of troopers per capita of one Alaska State Trooper per 971 residents in Detachment C.

22. Troopers throughout the state generally operate in a reactive mode, responding to calls for service. Troopers provide services to the communities served by their post based primarily on the number and nature of calls for service from those communities. Troopers attempt to respond to all emergencies immediately, and to respond to reports of felony activity as quickly as possible. Response time to calls for service both on and off the road system can depend on weather and the available methods of transportation. Response time can also depend upon prioritization of calls. Troopers have received many complaints from Alaskans both on and off the road system regarding the perceived delay in responding to calls for assistance.

. . . .

101. At trial, Plaintiffs introduced evidence that there was an "Indian Police" program in effect in Alaska from approximately 1885 through 1907.

102. Plaintiffs offered evidence that the Indian Police program, when it was in effect, was a race-based system of law enforcement. As Plaintiffs' expert Stephen Conn indicated in his second report, "To the extent that [such] category of Native policeman was granted authority to enforce the law, the subjects of that authority were Natives in Native villages." [Exh. P–2 at 2] Plaintiffs demonstrated that the Indian Police at the turn of the last century were Alaska Native officers only; their jurisdiction was limited to offenses committed in Alaska Native villages; and they focused their attention exclusively on crimes involving Alaska Natives.

103. At trial, Plaintiffs did not present any direct evidence that the State of Alaska adopted the federal Indian Police model from the turn of the last century. As Plaintiffs acknowledged, their claim in that respect rested exclusively on circumstantial evidence of certain similarities between the federal Indian Police program and law enforcement programs established by the State after statehood. Like the former federal Indian Police officers, officers in programs established by the State of Alaska are clothed, paid, and supervised by various applicable governmental agencies. But because the same could be said of the vast majority of law enforcement officers worldwide, those similarities are worth little weight as evidence that the State of Alaska adopted the federal Indian Police program.

104. As the chart prepared by Professor Conn on cross-examination demonstrated, there are several important differences between the federal Indian Police program and programs established by the State of Alaska after statehood. For example, VPSOs working in Alaska today have considerably broader duties than the federal Indian Police officers had. Service in the Indian Police appears to have been limited to Alaska Natives, but service in the VPSO program is not limited to Alaska Natives. Further, there are VPSOs stationed in communities with populations that are not predominately Alaska Native, while Indian Police were limited to service in predominately Native communities.

105. At trial, Professor Angell and others testified that the VPSO program was established based on the advice of knowledgeable people in the law enforcement field and did not represent an effort by the State to resurrect an old federal model of law enforcement that had been in place during the late 1800's and early 1900's. The passage of time between 1907—the last date for which Plaintiffs

have introduced evidence of the operation of the federal Indian Police program—and statehood further supports this court's finding that the State did not adopt the Indian Police program when establishing its law enforcement programs.

106. For the foregoing reasons, this court found that Plaintiffs did not prove that the State adopted the former Indian Police program when the State established its own law enforcement programs after statehood.

107. At trial, Plaintiffs also sought to prove that the State violated the equal protection clause of the Fourteenth Amendment of the United States Constitution by establishing and maintaining its own *de jure* race-based systems of law enforcement after statehood. Plaintiffs assert that the current VPSO program is directly traceable to race-based models of law enforcement that Plaintiffs allege the State of Alaska had established in the past.

108. With respect to this federal constitutional claim, Plaintiffs have acknowledged that none of the past or current state officials whose actions are challenged in this case have acted based on hostility or racial disfavor toward Alaska Natives.

109. Plaintiffs have identified several historical documents that they assert constitute evidence that the VPSO program as operated in Alaska today is traceable to explicitly race-based law enforcement program developed by the State in the past.

110. Although there are excerpts from Plaintiffs' exhibits that express a desire on the part of various State officials over the past decades to hire Alaska Natives and speakers of Alaska Native languages for village police or public safety positions, Plaintiffs did not demonstrate that being Alaska Native was a requirement for any such job. Plaintiffs also failed to demonstrate that any State programs as originally established or as currently operated limited the authority of village officers to enforce the law only against Alaska Natives. And Defendants demonstrated that there are at least two communities with VPSOs in which the population is predominantly non-Native.

111. Since long before statehood, the majority of the residents of Alaska's smallest and most remote communities have been Alaska Native. In developing community policing programs in these communities to supplement the law enforcement services provided by the AST, State officials have on occasion made reference to these demographics. But Plaintiffs have not established that in creating the VPSO program, or in creating any predecessors to that program, the State established a system of law enforcement in which a person's race or a community's racial composition were determinative factors in the type of law enforcement services to be provided.

112. With respect to their federal equal protection claim, Plaintiffs have not proven that Defendants adopted or established a *de jure* race-based dual system of law enforcement to provide particular law enforcement services to Alaska Natives in remote locations and different law enforcement services to other Alaskans.

*Plaintiffs' State Equal Protection Claims*

. . . .

116. A critical threshold inquiry of Plaintiffs' state equal protection claim is a demonstration by Plaintiffs that due to the Defendants' policies and practices, Plaintiffs are receiving a different level of law enforcement services from other similarly situated Alaskans.

117. This court denied summary judgment to Defendants as to Plaintiffs' state equal protection claims because the parties disputed many of the material facts underlying the equal protection analysis. Alaska Rule of Civil Procedure 56. *State v. Planned Parenthood,* 35 P.3d 30, 46 (Alaska 2001).

118. At trial, both parties offered considerable evidence on the question of whether Plaintiffs are provided law enforcement services inferior to those provided by Defendants to other Alaskans. Both parties submitted detailed statistical analysis of the allocation of trooper resources and extensive criticism of each other's statistical models.

119. At trial, Plaintiffs asserted that their home communities were among 165 "off-road" communities with at least twenty-five residents in which no law enforcement officer certified by the Alaska Police Standards Council was posted. The parties referred to those communities as "places in the complaint" and presented conflicting statistical and anecdotal evidence as to whether the "places in the complaint" receive law enforcement services inferior to those provided in communities "on the road system" that also lack local law enforcement personnel certified by the Alaska Police Standards Council.

120. There are significant differences between the Plaintiffs' home communities and many of the "off-road" communities that Plaintiffs have characterized as "places in the complaint."

121. The size of the "places in the complaint" varies considerably. Many of the 165 "places in the complaint" are less populated than the Plaintiffs' home communities. For example, Bettles, Birch Creek, Ivanof Bay, Karluk, Kasaan, Lake Minchumina, Meyers Chuck, Nikolski, Platinum, and Red Devil all have populations of less than 50 people. [Ex. P–27] Other "places in the complaint" are much larger. For example, Hooper Bay has a population of more than one thousand people.

122. Some of the "places in the complaint" have relatively stable populations, while others have seasonal residents with weaker ties to the community.

123. Some of the "places in the complaint" have judicial facilities, while others do not.

124. Some of the "places in the complaint" are easily accessible from communities with officers certified by the Alaska Police Standards Council. For example, Pitka's Point is not far from St. Mary's. Teller is connected by road to Nome, which serves as a trooper hub. The Aleknagik South Shore Road is connected to Dillingham by a gravel road that troopers may use to respond to calls. [Ex. P–58]

125. Other communities are relatively less accessible due to their distance from the hub post or other factors such as a lack of runway lights.

126. Some "places in the complaint" have VPSOs and/or VPOs. Akiachak and Tuluksak are among those communities. Approximately seventy-four of the "places in the complaint" have no local law enforcement or public safety personnel. Clark's Point is one of those communities. With the notable exception of an area that the parties label Kodiak Station and represent as having a population of almost two thousand people, the "places in the complaint" with no local law enforcement or public safety personnel are among the smallest communities in that group. [Ex. P. 27]

127. Some of the "places in the complaint" have restrictions on alcohol importation sale or possession; others do not.

128. At the time of the filing of this action, of the 165 off-road communities identified by the Plaintiffs as "places in the complaint," 129 are predominantly Native and 36 are less than 50 percent Alaska Native. Of the 36 predominantly non-Native communities, only three of the communities have any local law enforcement at all. Of the 129 predominantly Native communities, 88 of these communities (68%) have either a VPSO or a VPO.

129. The "places in the complaint" are not particularly similar to each other except insofar as the communities generally lack road access and resident certified law enforcement officers and are relatively small.

130. The law enforcement needs of the "places in the complaint" vary considerably and a variety of mechanisms might need to be employed in order to provide appropriate law enforcement services to those communities.

131. There are also significant differences among the "on-road" communities under the primary jurisdiction of the troopers to which Plaintiffs have compared the "places in the complaint."

132. Some of the communities Plaintiffs categorize as being "on-road" are large, while others are small. They range from an area designated as "College," with a population of

12,407 to Ekuk, with a population of 2. [Ex. P–34]

133. The "on-road" communities vary in distance from trooper posts, population density, economic stability, age of population, and other factors that might correlate to the relative need for law enforcement services. Some "on-road" communities can be reached relatively easily from urban centers such as Anchorage or Fairbanks, while others are more remote. Some communities characterized as being "on-road" are located on islands with roads that are connected to Alaska's larger highway system only by ferry service.

134. Because the "places in the complaint" are not similar as a group to Plaintiffs' home communities, and because the communities characterized as being "on-road" are not uniformly similarly situated to the "places in the complaint," this court does not find the parties' statistical analyses of the allocation of trooper resources between "places in the complaint" and "on-road" communities to be particularly helpful to answering the question of whether Plaintiffs are provided comparatively inferior law enforcement services from the Alaska State Troopers.

135. The majority of individuals served by the AST in Detachment C live in off-road communities. Residents in this detachment have a trooper ratio of one trooper for every 971 residents.

136. The majority of individuals served by the AST in Detachments B and E live in on-road communities. Residents in each of these detachments have fewer troopers per capita than Detachment C, with one trooper for over 1,000 residents. *See* Finding # 21, above.

. . . .

138. The State has also demonstrated that the difference in crime rates between on-road and off-road communities is not of such a magnitude that a different per capita allocation of law enforcement resources is mandated for these two types of communities. Taken as a whole, neither group of communities can be said to experience significantly more crime than the other. Although there are disparities in the types of crimes between on-road and off-road communities, the overall crime rates are comparable. AST has fairly allocated troopers in a manner that adequately addresses the crime risk experienced in on-road and off-road communities.

139. Plaintiffs did present testimony that suggested that residents of off-road communities lacking a regular presence of certified law enforcement officers experienced particular difficulties in the receipt of law enforcement services. As Commissioner Godfrey acknowledged at trial, an off-road community without any local police may not be receiving the same level of police protection that the troopers are able to provide to on-road communities. [Tr. at 1038]. But this court finds these discrepancies are due principally to the geographic isolation, weather conditions and transportation difficulties inherent in the location of many off-road communities, and not to an unconstitutional under-allocation of trooper resources to the more remote communities in this state. *Cf. Massachusetts Gen. Hosp. v. Weiner*, 569 F.2d 1156, 1161 (1st Cir.1978) (holding no denial of equal protection where, for purposes of setting Medicare rates, there is uniform treatment of urban teaching hospitals and rural hospitals) *cited in Evans v. State of Alaska*, 56 P.3d 1046, 1055 (Alaska, 2002). The Plaintiffs have not demonstrated that the Defendants' policies and practices have had the effect of systematically depriving Plaintiffs of law enforcement services provided to other Alaskans.

140. Plaintiffs have not demonstrated that the racial composition of a community is a factor that affects the allocation of Alaska State Trooper case-related hours to that community.

141. Many off-road communities, including some of the communities that are home to Plaintiffs, have VPSOs and/or VPOs who provide additional and significant law enforcement services to residents in addition to the law enforcement services provided by the troopers. These additional law enforcement services are not generally available in on-road communities, and provide further support for this court's conclusion that no violation of equal protection has been demon-

strated in the allocation of law enforcement resources to the Plaintiffs.

142. This court's conclusion that no equal protection violation has been demonstrated is based on this court's review of the allocation of law enforcement resources in the State of Alaska during the pendency of this litigation. Plaintiffs introduced as exhibits a large amount of historical materials that would tend to demonstrate a more disparate allocation of law enforcement resources in prior years and decades, indicating times when rural Alaskans, including rural Native Alaskans, received considerably less in the way of law enforcement services. This court need not and does not determine whether there may have ever been in years past a violation of equal protection in the provision of law enforcement services. In this same regard, the court also notes than the testimony and exhibits introduced at this trial demonstrated a remarkably high level of commitment by many individuals from many different perspectives over many years, all dedicated toward improving the delivery of law enforcement services to Alaskans, including but not limited to Native Alaskans, that reside in the more remote parts of this state.

143. As a matter of social and economic policy, there may be merit in the view of some of the witnesses at trial that remote communities in Alaska would be safer if the State posted troopers or other certified law enforcement officers on a full time basis within each such community. There may also be merit to the assertion of a number of witnesses that public safety needs would be better met if the VPSO program were strengthened by increasing the program budget to improve training, salaries, and equipment for VPSOs. Many such changes might be possible if more state resources were devoted to law enforcement in the Plaintiffs' home communities. But within the confines of the total resources allocated to law enforcement at this time, such changes could well be at the expense of law enforcement services in other communities or, on a broader scale, at the expense of other public health and safety services.

. . . .

145. With respect to their state equal protection claim, Plaintiffs have not proven that that the State's existing system of allocating trooper resources deprives them of law enforcement services that are provided to similarly situated Alaskans. No violation of equal protection has been demonstrated on the basis of trooper allocation alone. And since, in this court's view, the VPSO and VPO programs are viewed as a valuable supplement to (and not a substitute for) the troopers' law enforcement services, their addition to some of the Plaintiff communities does not constitute an equal protection violation.

. . . .

### Lack of Written Guidelines

. . . .

149. The court further finds that deployment of troopers from established posts is done on an individualized basis taking numerous factors into account. Plaintiffs have not demonstrated that race has been a factor in the allocation of trooper resources. Rather, factors such as population, transportation capabilities, incidence of crime, location of judicial facilities, and budget realities have been used in the allocation of trooper resources. The court does not find that the failure to adopt written guidelines defining where it is appropriate to locate troopers has deprived the Plaintiffs of services provided to similarly situated Alaskans or violated their rights to due process under the Alaska Constitution or the United States Constitution.

. . . .

### Conclusion

Plaintiffs have not proven that the State of Alaska's law enforcement programs, policies, and practices challenged in this litigation violate any state or federal statutes or any provisions of the United States Constitution or the Alaska Constitution. Therefore, IT IS ORDERED that the Defendants are entitled to judgment on all remaining causes of action.

Entered at Anchorage, Alaska this 30th day of September, 2002.

/s/ Sharon Gleason
Sharon L. Gleason
Superior Court Judge